PEOPLE v TIERNEY

Docket No. 252185. Submitted May 17, 2005, at Marquette. Decided
   June 14, 2005, at 9:00 a.m. Leave to appeal sought.
   Steven E. Tierney was convicted by a jury in the Marquette Circuit
      Court, Thomas L. Solka, J., on two counts of premeditated,
      first-degree murder, MCL 750.316(1)(a), and sentenced to concur-
      rent terms of life imprisonment. The defendant appealed, chal-
      lenging several pretrial and trial rulings by the court.
      The Court of Appeals *held*:
      1. The trial court properly held that the police officers' entry
   into the enclosed porch of the defendant's parents' home was not
   a violation of US Const, Am IV. The officers had no search warrant
   or arrest warrant and did not search the porch area. The porch was
   an unheated, enclosed, entry-type porch. Its outer door was a
   screen door, and there was no knocker or doorbell outside the
   porch, but there was a doorbell at the interior door leading to the
   remainder of the house from the porch. There was a "welcome"
   sign located next to the interior door. There were windows dividing
   the porch from the rest of the house. The porch was used for
   storage of personalty, not as living space. Under these circum-
   stances, an occupant would have no reasonable expectation of
   privacy on the porch.
      2. The trial court properly held that the police officers' entry
   into the house was not a violation of US Const, Am IV. A search or
   seizure without a warrant is unreasonable in itself unless a specific
   exception applies. In this case, the emergency-aid exception to the
   warrant requirement allowed the officers to enter the dwelling
   because they reasonably believed, based on specific and articulable
   facts, that the defendant was in immediate need of aid. The
   specific and articulable facts were that as one officer prepared to
   knock on the inner door of the porch, he observed a motionless
   person sitting at the kitchen table, slumped over with his head
   resting on the table, with a rifle and a box of bullets close by. This
   observation caused the officer to believe that the suspect could
   have shot himself and could be injured.
      3. The trial court properly held that the police officers' arrest
   of the defendant without a warrant was lawful. The arresting

officer knew when he arrived at the suspect's parents' residence that he was a suspect in two murders. As the officer entered the kitchen, the suspect stated, "Just shoot me. I can't spend the rest of my life in prison. Let me kill myself." A fair-minded person of average intelligence would be justified in believing that the suspect had committed the murders.

4. The trial court properly held that the police officers did not violate the defendant's right against self-incrimination. US Const, Am V; Const 1963, art 1, § 17. The prosecution had to show that the defendant voluntarily waived the right. Although he was suicidal and intoxicated when he made the out-of-court statements admitted as evidence at trial, the defendant is college educated, has previous experience in the criminal justice system, and was not threatened, harmed, or denied any basic necessities he required. He was rational and coherent and assisted the officers in creating a written record of the interview. The totality of the circumstances demonstrates that the defendant's waiver was voluntary. The prosecution also had to show that the defendant knowingly and intelligently waived the right. Although the defendant claimed to be intoxicated, he acknowledged receiving his *Miranda* rights and was willing to waive them and to speak with the officers. The defendant was not confused; his intoxication did not interfere with his ability to understand and to answer the questions asked of him. The defendant was rational and not delusional during the questioning. He knowingly and intelligently waived his Fifth Amendment right against self-incrimination.

5. The trial court correctly concluded that the defendant did not properly invoke his right to counsel under US Const, Am VI. A defendant's invocation of the right to counsel must be un-equivocal. Defendant's statements, "Maybe I should talk to an attorney" and "I might want to talk to an attorney," are not unequivocal, so the defendant never invoked his constitutional right to counsel. His statements were admissible.

6. The trial court properly denied the defendant's motion for in-court testimony of an expert witness relating to intent, premeditation, and malice aforethought. The defendant claimed that intoxication had obviated his criminal responsibility for the acts. However, only mental illness or retardation are viable defenses in the category of diminished capacity defenses. *People v Carpenter*, 464 Mich 223 (2001). Because the defendant was not claiming to be mentally ill or retarded, there was no legal basis for admission of testimony from an expert witness. Because the defendant was left open the right to present lay testimony that he did not have the

requisite intent to commit the charged crimes, the court's ruling did not deny the defendant his right to present a defense. The ruling merely denied the defendant the right to present evidence of diminished capacity.

7. The trial court properly denied the defendant's motion for a jury instruction on the necessarily included lesser offense of voluntary manslaughter. The defendant asserted that there was evidence to support this charge. If a rational view of the evidence supports an instruction for voluntary manslaughter, the instruction must be given. Voluntary manslaughter requires the prosecution to prove that the defendant killed in the heat of passion rather than out of reason, the passion was caused by adequate provocation, and there was no lapse of time during which a reasonable person could have controlled his passions. In this case, the defendant had asked one of the victims for dates, offered his assistance to her in any way, and proposed marriage to her, all of which she rejected. No reasonable jury could find that adequate provocation existed with respect to that victim. The defendant did not know the other victim personally and did not recognize him until he stepped out of a truck at the home of the first victim. No reasonable jury could find that adequate provocation existed with respect to the second victim. Further, nine hours elapsed between the time the defendant saw the victims kiss and the time he shot them. He had to drive nearly three hours to obtain the guns and ammunition for the killing. No reasonable jury could find that there was no lapse of time during which a reasonable person could have controlled his passions.

Affirmed.

1. SEARCHES AND SEIZURES — HOMES — ENCLOSED PORCHES.

Where a porch is unheated, unlocked, and uninhabited except for the storage of personalty, and where there is an outside-type door, between the porch and the living space of the home, the occupant has no objectively reasonable expectation of privacy on that porch that would preclude a police officer from entering that porch without a warrant (US Const, Am IV; Const 1963, art 1, § 11).

2. SEARCHES AND SEIZURES — HOMES — EMERGENCY-AID EXCEPTION.

The general rule that a search or seizure within a home is unreasonable is subject to an emergency-aid exception, which provides that entry by police officers is allowed when they reasonably believe, based on specific and articulable facts, that a resident is in need of immediate aid (US Const, Am IV; Const 1963, art 1, § 11).

3. HOMICIDE — PREMEDITATED MURDER — EXPERT WITNESS — DIMINISHED
     CAPACITY.

> Where a defendant charged with premeditated murder is not claim-
> ing to be mentally ill or retarded, there is no legal basis for the
> admission of testimonial evidence from an expert witness regard-
> ing the defendant's diminished capacity for responsibility for his
> criminal acts as a result of intoxication and relating to his intent,
> premeditation, or malice aforethought.

*Michael A. Cox*, Attorney General, *Thomas L. Casey*,
Solicitor General, *Gary L. Walker*, Prosecuting Attor-
ney, and *Cheryl L. Hill*, Civil/Appellate Counsel, for the
people.

State Appellate Defender (by *Chari Grove*) for the
defendant.

Before: MURRAY, P.J., and O'CONNELL and DONOFRIO,
JJ.

MURRAY, P.J.

## I. INTRODUCTION

Defendant was convicted on two counts of first-degree,
premeditated murder, MCL 750.316(1)(a), for the am-
bush murder of two of his coworkers. Defendant was
sentenced to concurrent terms of life imprisonment.
Defendant appeals as of right, challenging decisions
made by the trial court both before and during the trial.
After a thorough review of defendant's arguments, we
conclude that the trial court did not err in any of its
decisions. Consequently, we affirm.

Because the most significant and difficult legal issues
raised by defendant relate to the trial court's rulings on
several pretrial motions, we will detail the testimony
from the motion hearings. We will address the pertinent
facts brought out at trial when relevant to defendant's
claims of legal error alleged to have occurred during trial.

## II. MOTION HEARING EVIDENCE

Before the trial, defendant filed a series of motions in limine seeking to suppress certain evidence, including his statements made to police officers before and during questioning on the night of February 15, 2003, and various pieces of physical evidence seized following his arrest. Defendant also sought a ruling on the admissibility of evidence regarding his mental state at the time he committed the charged crimes. Hearings were held on these motions over the course of five days, with the testimony establishing the following sequence of events.

On February 15, 2003, Michigan State Police Troopers Jonah Bonovetz and Jason Tasson learned that defendant was a suspect in the murders of Sally Paajanen and Craig Fleck, two of defendant's coworkers at a Michigan Department of Corrections prison facility. Accordingly, the troopers went to defendant's parents' home that evening to contact defendant. When they arrived at the home, they found defendant's truck in the driveway. The troopers observed a light on in the home and heard loud music coming from inside. Bonovetz approached the door of an enclosed porch and knocked, while Tasson went to the side of the house. When Bonovetz received no answer, he opened the unlocked porch door and crossed the porch to knock on the inner residence door, with Tasson following. Both troopers testified that the porch did not appear to be a living area. Looking through a window in the inner door as he knocked on it, Bonovetz saw a man, subsequently identified as defendant, sitting at the kitchen table with his back to the door, slumped over the table, a rifle and ammunition visible on the table next to his right hand. When defendant did not respond to loud knocking on the inner door, Bonovetz opened the unlocked door and walked into the kitchen. When Bonovetz opened the

door, Tasson observed defendant slumped over the table with a rifle near his right hand.

As Bonovetz entered the kitchen and went to defendant's side, he announced the police officers' presence and called out defendant's name, at the same time moving the gun out of defendant's reach. Defendant lifted his head, looked at Bonovetz, and stated, "Just shoot me. I can't spend the rest of my life in prison. Let me kill myself." At that point, defendant was placed in handcuffs for his and the officers' safety. Defendant was read *Miranda*[1] warnings and was then held at his parents' house for approximately 3½ hours while Bonovetz and Tasson waited for additional officers to arrive. When Marquette County Sheriff's Officers Scott Johnson and Charles Custard, and Michigan State Police Trooper Walley Helmila arrived, one of them again read *Miranda* warnings to defendant, and the officers then questioned defendant for a number of hours.

Tasson and Bonovetz described defendant as intoxicated and depressed or suicidal, but not behaving as though he were crazy or mentally ill, or in need of medical assistance. Helmila, who knew defendant personally, explained that, although intoxicated, defendant was capable of carrying on a conversation, able to understand the questions asked of him, and did not appear delusional. Indeed, of all the police officers at the scene, only Johnson testified that defendant did not appear intoxicated. Helmila described how defendant twice made a comment about possibly wanting to talk to an attorney, but when asked whether he wanted to continue the interview, defendant twice told the police officers to continue asking questions. At the end of the

---

[1] *Miranda v Arizona*, 384 US 436, 473-474; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

questioning, Helmila wrote notes regarding the information received from defendant. Helmila and defendant then went over the notes so that defendant could clarify certain points.

According to the officers' testimonies, the porch was enclosed, with windows on the outer walls that were partially covered with blinds. There was no doorbell or knocker outside the outer door. The inner wall had windows into the house with lace curtains on them, and the inner door to the home was made of wood, with a window in it. A wooden welcome sign was hanging next to the inner house door. The porch appeared to be a storage area, rather than a living area or a place to spend time.

Defendant also produced several witnesses who testified about whether the enclosed porch was open to public entry or considered a private part of the home. Lorraine and John Elliott, defendant's mother and stepfather, testified that the family considered the porch to be private and a part of the residence itself. They stated that the outer porch door was locked at night, that a doormat was kept outside the outer door, and that people coming to the home, even close family members, were expected to knock on the outer door and not to enter the porch uninvited. Both insisted that the inner door was never locked, but both did admit that the inner door contained a working lock. They also admitted that there was no doorbell or knocker outside the outer door of the porch and that it was not always possible to hear people knocking on this door. They further admitted that the porch was used for storage, that it contained no heat vents, and that they did not spend much time in the porch.[2]

---

[2] Holly Blubaugh, who rented the house from defendant's mother for approximately seven months in 1977 and 1978, stated that for those

On September 29, 2003, the trial court issued a thorough, well-reasoned opinion and order denying defendant's three motions. The trial court's rationale will be highlighted in the relevant sections below.

### III. ANALYSIS

#### A. PRETRIAL DECISIONS

##### i. THE POLICE OFFICERS' ENTRY INTO THE ENCLOSED PORCH

We first address defendant's assertion that the statements and physical evidence obtained at the house should have been suppressed because they were obtained as a result of the police officers' unlawful entry into the enclosed porch of defendant's parents' home. This is a significant legal issue because, if defendant were correct, much of the evidence used to convict him would be inadmissible as obtained in violation of the Constitution. *People v Goldston*, 470 Mich 523, 528; 682 NW2d 479 (2004); *People v Stevens (After Remand)*, 460 Mich 626, 633-634; 597 NW2d 53 (1999). It is likewise significant given the constitutional interest at stake.

The Fourth Amendment of the United States Constitution provides:

---

seven months, the porch was used only as a storage room for shoes and hanging coats. When she lived in the home, guests were expected to knock on the outer door and wait there for a response. Blubaugh considered the porch to be private and part of the residence itself; however, she agreed that there was no doorbell or knocker on the outer door, and that she never used the porch for entertaining.

Sally Hall, a friend of defendant's mother, testified that she always knocked on the outside door and that she did not believe she had ever instead gone in and knocked on the inner door. She stated that she believed the porch was private, but admitted that there was no doorbell outside the porch door.

> The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.[3]

Relying upon longstanding precedent from the United States Supreme Court, our Court has continually recognized that " ' "[a]t the very core" ' of the Fourth Amendment "stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." ' " *People v Bolduc*, 263 Mich App 430, 439-440; 688 NW2d 316 (2004), quoting *Kyllo v United States*, 533 US 27, 37; 121 S Ct 2038; 150 L Ed 2d 94 (2001), quoting *Silverman v United States,* 365 US 505, 511; 81 S Ct 679; 5 L Ed 2d 734 (1961). Indeed, " ' "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." ' " *Bolduc, supra* at 440, quoting *Payton v New York*, 445 US 573, 585-586; 100 S Ct 1371; 63 L Ed 2d 639 (1980), quoting *United States v United States District Court*, 407 US 297, 313; 92 S Ct 2125; 32 L Ed 2d 752 (1972). See, also, *People v Nunez*, 242 Mich App 610, 621; 619 NW2d 550 (2000) (O'CONNELL, J., concurring).

That being the case, " 'searches and seizures inside a home without a warrant are presumptively unreasonable,' " *United States v Martinez*, 406 F3d 1160, 1163 (CA 9, 2005), quoting *Payton, supra* at 586 (citation deleted), because "the Fourth Amendment has drawn a firm line at the entrance to the house." *Id.* at 590.

---

[3] US Const, AM IV. Further, Const 1963, art 1, § 11 provides the same rights against government action as contained in its federal counterpart, but containing specific public safety exceptions. *People v Kazmierczak*, 461 Mich 411, 417; 605 NW2d 667 (2000).

However, the United States Supreme Court has noted that an entry without a warrant may be reasonable under the Fourth Amendment when there are diminished expectations of privacy or minimal intrusions by police officers. *Illinois v McArthur*, 531 US 326, 330; 121 S Ct 946; 148 L Ed 2d 838 (2001).

In addressing an issue similar to the one we face today, the Supreme Court of North Dakota recognized the ultimate question presented in light of the *Payton* Court's holding:

> But, what or where is the threshold to a house? Where should the line be drawn when a house has an enclosed porch, vestibule, or entryway attached to the home? We must look at the reasonableness of each situation, giving due consideration to the particular characteristics of the home in question: "The ultimate standard set forth in the Fourth Amendment is reasonableness." *Cady v. Dombrowski*, 413 US 433, 439; 93 S Ct 2523, 2527; 37 L Ed 2d 706, 713 (1973). [*State v Kitchen*, 572 NW2d 106, 109 (ND, 1997).]

In *People v Williams*, 472 Mich 308, 314; 696 NW2d 636 (2005), our Supreme Court recently reiterated that the facts of each case control the Fourth Amendment inquiry:

> In assessing the protections created by this amendment, the United States Supreme Court has "long held that the 'touchstone of the Fourth Amendment is reasonableness.' " *Ohio v Robinette*, 519 US 33, 39; 117 S Ct 417; 136 L Ed 2d 347 (1996) (citation omitted). Reasonableness is measured by examining the totality of the circumstances. *Id.* Because of " 'endless variations in the facts and circumstances' " implicating the Fourth Amendment, reasonableness is a fact-intensive inquiry that does not lend itself to resolution through the application of bright-line rules. *Id.*, quoting *Florida v Royer*, 460 US 491, 506; 103 S Ct 1319; 75 L Ed 2d 229 (1983).

In the present case, the state troopers did not have a search warrant when they entered the enclosed porch, and the prosecution has not suggested that any exception to the warrant requirement existed. Thus, the issues are whether defendant had an objectively reasonable expectation of privacy in the enclosed porch, and, if so, whether defendant's Fourth Amendment right against unreasonable searches or seizures was violated.

There is no published case law in Michigan directly on point.[4] However, courts in several of our sister states have considered this question under similar circumstances and have held that no reasonable expectation of privacy exists in an enclosed or screened-in porch. In determining whether a reasonable expectation of privacy exists, those cases have largely focused on whether the porch was part of the living area of the home. Moreover, these courts have recognized the reasonableness of police officers' entries into such porches in order to communicate with any possible occupant.

The Illinois Court of Appeals has issued several noteworthy opinions on this issue. For example, in *People v Arias*, 179 Ill App 3d 890; 535 NE2d 89 (1989), the police officers approached a private residence to contact a suspect. *Id.* at 892. The officers entered an enclosed, unlocked porch to reach the front door of the residence, one of two apartments in the building. *Id.* at 893. The court concluded that the officers did not violate the defendant's Fourth Amendment rights when they entered the enclosed porch, finding that there was

---

[4] Although not raised by defendant, neither *People v Harvey*, 38 Mich App 39; 195 NW2d 773 (1972), nor *People v Ortiz (After Second Remand)*, 224 Mich App 468; 569 NW2d 653 (1997), rev'd 456 Mich 945 (1988), is particularly helpful. Both cases involved knock and announce statutory issues, and neither contains any Fourth Amendment analysis. To the extent *Harvey* can be read to touch on a Fourth Amendment issue, it supports our conclusion in this case.

no reasonable expectation of privacy in the enclosed porch. *Id.* at 896. In reaching this conclusion, the court relied on prior cases that focused on the concept of a living space or "home" as a basis for determining whether a reasonable expectation of privacy existed. *Id.* at 895-896. Detracting from a possible conclusion that there was a reasonable expectation of privacy were the facts that neither the defendant nor anyone in the defendant's family dwelled on the porch with the intent to remain there indefinitely, the porch was functionally and structurally different from the rest of the home, the porch was a storage place, the porch was surrounded by windows (with a screen-door entry and with a heavy wooden door between the porch and the home itself), the windows between the home and the porch were covered by shades, there was no doorbell outside the porch door, and the porch door was not locked. *Id.* at 895.

Likewise, in *People v Greene*, 289 Ill App 3d 796; 682 NE2d 354 (1997), the court concluded that police officers did not violate the defendant's Fourth Amendment rights when they entered a screened-in porch and knocked on an inner door. In that case, the officers approached a private residence to investigate a 911 hang-up call received from that residence. *Id.* at 800. In making its finding, the court noted that there was neither any furniture nor any other object on the front porch, the inner door to the home itself was closed, and the porch was entered through a screen door that was unlocked. *Id.* The court found that the defendant had a lesser expectation of privacy in his porch than in his residence proper. *Id.* at 802.

In *State v Edgeberg*, 188 Wis 2d 339; 524 NW2d 911 (1994), the Wisconsin Supreme Court held that the defendant had no reasonable expectation of privacy in a

porch or vestibule-type addition to a residence. In that case, police officers approached a private residence to investigate a barking dog complaint. *Id.* at 342. They approached and entered an enclosed, unlocked porch or vestibule-like addition to the home, which appeared to be the main entrance to the house. *Id.* at 342-343. In holding that the defendant had no reasonable expectation of privacy in the porch, the court noted that the porch had an unlocked screen door, a wooden door with windows between the porch and the living areas of the house, no doorbells at either door, and that the porch contained a washer and dryer and work clothes. *Id.* at 343. The court concluded that although the porch may have been used as a laundry area, it also was used as an entryway. *Id.* at 346. The court further noted that it was a community practice to enter the porch to knock on the inner door. *Id.* at 346-347. See, also, *State v Edwards*, 36 SW3d 22, 27 (Mo App, 2000); *State v Prudhomme*, 287 NW2d 386, 389 (Minn, 1979), and *Kitchen, supra.*

Several other courts have not only focused upon the contents and characteristics of the porch, but also on the police officers' actions and reasons for entering the porch. For example, in *Commonwealth v McDonnell*, 512 Pa 172; 516 A2d 329 (1986), the Pennsylvania Supreme Court upheld against a Fourth Amendment challenge the officers' entry into an unoccupied porch to knock on the interior door of the porch. In doing so, the court highlighted the reasonableness under the circumstances of the officers' entering the porch to gain the occupant's attention:

> We find nothing in this record which indicates that their action was unreasonable. Trooper Helwig testified that he did not believe that the occupants of the house could hear a knock at the porch door; he could see that the porch was not occupied, and was used for storage. Therefore, he and

the other police officers entered the porch and knocked on the door to the house proper. No search was conducted on the porch after they entered. After identifying himself, Trooper Helwig explained his purpose and appellee allowed the officers to enter the house. These facts show that the officers' sole intention in following this course of action was to effectively comply with the "knock and announce" rule. Under the circumstances, we find that this was constitutionally reasonable conduct. [*Id.* at 177.]

The *Arias* court arrived at the same conclusion:

[Police officers] entered the porch merely to knock on the door of the house—to make their presence known. The officers' actions are not proscribed under the fourth amendment; on the contrary, their actions are encouraged by the requirement that officers knock on the suspect's door and announce their presence. [*People v Marinez*, 160 Ill App 3d 349, 353; 513 NE2d 607 (1987).] Their entry of the porch to knock on the interior door was no more intrusive than that of a man delivering packages, "a boy collecting for the newspaper or a little girl selling girl scout cookies." [*People v Jones*, 119 Ill App 3d 615, 622; 456 NE2d 926 (1983)]. Other State supreme courts have held that the entry by police officers of an enclosed back porch in order to knock on an interior door did not violate the principles of reasonableness imposed upon those conducting government searches and seizures. [*Arias, supra* at 896.]

We agree with the foregoing courts' analyses of the relevant criteria for determining whether defendant[5] had an objectively reasonable expectation of privacy in the enclosed porch.

The trial court's factual findings on this issue focused on the criteria set forth above. The court's pertinent findings were as follows:

---

[5] Although defendant's standing to challenge the police officers' entry into his parents' porch was challenged below, it is not contested on appeal.

The Court has considered all of this testimony, including physical observations, descriptions of the porch, and the photographic evidence of the porch. The Court has weighed the credibility and demeanor of both the People's witnesses that testified they would routinely enter typical porch areas such as this, and the testimony of Defendant's mother, stepfather, their friends and former tenants, that people would universally not enter that porch without their permission. Although Defendant's mother and stepfather may have a subjective expectation of privacy on the porch, the Court finds the testimony of Defendant's mother, stepfather and Mrs. Hall that a friendly visitor would never enter that porch area to be questionable, given the description and physical layout of the porch. The Court does not find the homeowners' subjective expectation to be a reasonable expectation to be recognized by society.

The Court finds the porch to be a very typical enclosed, entry-type, porch for the Upper Peninsula. It is not unusual to have a porch area completely enclosed with storm windows and a storm door to act as an "airlock" in keeping out subzero temperatures of Upper Peninsula winters when someone enters a home from the outside. Exhibit No. 17 shows a threshold with a raised lip (weather stripping or similar) to keep the cold air of the porch from entering the home. This is not typical of an interior door. It would be reasonable for people to first enter into an enclosed porch area, close the porch doors behind them, and then only when secure from the inclement outside air, enter into the home.

The Court notes this porch area is unheated, and not tied into the central heating system of the home. The Court finds the presence of the "Welcome" sign on the inner wall to be consistent with a reasonable expectation of that wall and door serving as the primary barrier to entry into the private dwelling area. It would not likely be placed on that wall, reasonably, unless the homeowners and occupants expected someone to see it for the first time on approaching that entry door. The Court notes there are no doorbells or knockers outside the porch. The Court finds the presence of windows in the wall between the kitchen and the porch

area, and windows in the door between the kitchen and the porch area to be consistent with this area being a porch. The Court would find it unusual to have windows on a wall dividing interior rooms of a house and windows in a door dividing interior rooms of a house.

The porch is consistent in outer appearance with the remainder of the home, but that does not detract from its status as a porch.

While it is true many personal items of property were stored in the porch area, that, by itself, does not make the porch a part of the dwelling within which society should recognize a reasonable expectation of privacy. People store things on the outside of their home. That does not make the outside of the home a private area which has a constitutionally protected reasonable expectation of privacy. It is true that with a dishwasher stored on the porch, occupants of the home expect that dishwasher is private and safe from public use as suggested in questioning by defense counsel. However, that item of personal property is not unlike items of patio or lawn furniture set on the outside of a home in plain view from a public area or sidewalk. These outside personal property items are private, on private property, and a passerby does not have a right to use them simply because there are there in plain view. They don't lose their private status. However, the occupant of that home has no reasonable expectation of privacy of what can be seen in the vicinity of those specific items of private property. Thus, the storage of these items of personality [sic] on the porch area does not render that area a private part of the dwelling in which an occupant has a reasonable expectation of privacy.

The trial court's findings of fact were not clearly erroneous because there was evidence in the record supporting these findings. *People v Custer (On Remand)*, 248 Mich App 552, 558; 640 NW2d 576 (2001). Additionally, the trial court was in a much better position than we are—having actually seen and heard the testimony of the witnesses—to determine what

evidence was more worthy of credence. As a result, the only question remaining for us is whether the trial court correctly concluded that, under the facts as found, defendant did not have an objectively reasonable expectation of privacy in the enclosed porch. This ultimate ruling of the trial court is reviewed de novo. *Williams, supra* at 313.

At first blush, a review of the photographs of the house submitted below would lead one to conclude that the porch was part of the house. However, considering the unique facts of this case, *Williams,* and the case law set forth above, we conclude, as did the trial court, that defendant did not have a reasonable expectation of privacy in the enclosed porch of his parents' home. While the curtains evidence some attempt to protect the area from observation, the porch seems to have served as an entryway into the house. There was no doorbell located at the exterior door (which was a screen door), while there was one at the interior door. Also, the "welcome" sign was located adjacent to the interior door. For the most part, the porch did not have the characteristics of a living area. Rather, it was an unheated area used primarily as storage space. The trial court also noted the common practice in the upper peninsula of going inside enclosed porches before seeking entry to the house to keep out of the often harsh weather conditions. Accordingly, the trial court did not err when it concluded that the police officers lawfully entered the enclosed porch. Like any other visitor desiring to speak to an occupant of the residence, the police officers entered the porch simply to gain access to the door immediately adjacent to the residence. See LaFave, 1 Search & Seizure, Residential Premises (4th ed), § 2.3(f), 601 (observing that police officers conducting an investigation may go "to places visitors could be expected to go (e.g., walkways, driveways, porches)").

There was no intention or attempt to search the porch or its contents. Instead, the officers merely attempted to gain the attention of the occupant of the house, who, presumably because of the loud music, could not hear a knock on the porch door. The officers' actions were reasonable, did not violate a reasonable expectation of privacy, and did not violate the Fourth Amendment.

### ii. ENTRY INTO THE HOUSE

Defendant also asserts that the statements and physical evidence should have been suppressed because they were obtained as a result of the police officers' unlawful entry into the kitchen. However, because the officers lawfully entered the porch and then, in plain view, saw defendant lying motionless with a gun to his side, they lawfully entered the kitchen.

A search or seizure without a warrant is unreasonable per se "subject to several specifically established and well-delineated exceptions." *People v Borchard-Ruhland*, 460 Mich 278, 293-294; 597 NW2d 1 (1999). As noted earlier, evidence seized in violation of the federal constitutional prohibition against unreasonable searches and seizures is generally not admissible. *Goldston*, *supra* at 528. However, the emergency-aid exception to the warrant requirement allows police officers to enter a dwelling without a warrant under circumstances in which they reasonably believe, based on specific, articulable facts, that some person within is in need of immediate aid. *People v Davis*, 442 Mich 1, 20, 25-26; 497 NW2d 910 (1993).

Here, the unrefuted testimony of Bonovetz was that, as he prepared to knock on the inner door leading to the kitchen, he observed a motionless person sitting at the kitchen table, slumped over with his head resting on the table, his right hand on the table with a rifle lying a few

inches from his right hand. Bonovetz also observed a box of bullets on the table and believed that defendant may have shot himself and might be injured. Accordingly, under the circumstances presented when the troopers entered the porch, the emergency-aid exception to the warrant requirement applied, and the trial court correctly concluded that the officers lawfully entered the kitchen of defendant's parents' home. *Davis, supra* at 12 (the emergency-aid exception applies to prevent a shooting or bring aid to an injured person).

### iii. DEFENDANT'S ARREST

We also reject defendant's argument that the statements and physical evidence should have been suppressed because they were obtained as a result of the officers' unlawful arrest of defendant.

"A police officer may arrest an individual without a warrant if a felony has been committed and the officer has probable cause to believe that individual committed the felony." *People v Kelly*, 231 Mich App 627, 631; 588 NW2d 480 (1998); MCL 764.15(1)(c). In reviewing a challenge to probable cause, this Court "must determine whether the facts available to the arresting officer at the moment of arrest would justify a fair-minded person of average intelligence in believing that the suspected individual had committed the felony." *Kelly, supra* at 631. "The prosecution has the burden of establishing that an arrest without a warrant is supported by probable cause." *People v Davenport*, 99 Mich App 687, 691; 299 NW2d 368 (1980).

We have already concluded that the troopers were lawfully in the kitchen area at the time they arrested defendant. Moreover, the prosecution presented evidence that Bonovetz, the arresting officer, knew at the time he arrived at defendant's parents' home that

defendant was a suspect in the charged crimes, that he had been infatuated with Paajanen and had wanted to date her, and that he had not shown up for work that day. The prosecution also presented evidence that when Bonovetz entered the kitchen, defendant voluntarily stated, "Just shoot me. I can't spend the rest of my life in prison. Let me kill myself." These circumstances would justify a fair-minded person of average intelligence in believing that defendant had committed the charged crimes. Accordingly, the trial court correctly found that defendant's arrest was lawful.

In summary, the trial court did not err when it denied defendant's motions to suppress out-of-court statements and physical evidence. Defendant had no legitimate expectation of privacy in the enclosed porch. Therefore, the police officers did not violate defendant's Fourth Amendment rights when they entered the porch. Moreover, the officers lawfully entered the interior of the home because the emergency-aid exception to the warrant requirement applied. Finally, defendant's voluntary statement, together with the information the officers already possessed, provided probable cause to arrest defendant in connection with the charged crimes.

Defendant next argues that, assuming the police officers lawfully entered the kitchen, he did not knowingly and voluntarily waive his Fifth Amendment right, both because of his condition at the time the *Miranda* warnings were read and because of coercion by the police officers. Defendant also asserts that he invoked his Sixth Amendment right to counsel and that his invocation of it was not honored by the officers. We will separately discuss these independent constitutional issues, but we find that neither of these constitutional rights was violated.

iv. FIFTH AMENDMENT RIGHT AGAINST SELF-INCRIMINATION

The right against self-incrimination is guaranteed by both the United States Constitution and the Michigan Constitution. US Const, Am V; Const 1963, art 1, § 17; *People v Cheatham*, 453 Mich 1, 9; 551 NW2d 355 (1996) (opinion by BOYLE, J.). Statements of an accused made during a custodial interrogation are inadmissible unless the accused voluntarily, knowingly, and intelligently waives that Fifth Amendment right. *Miranda, supra* at 444. The prosecutor must show by a preponderance of the evidence that the defendant knowingly, intelligently, and voluntarily waived his Fifth Amendment right. *People v Daoud*, 462 Mich 621, 634; 614 NW2d 152 (2000). Whether a defendant's statement was knowing, intelligent, and voluntary is a question of law, which the court must determine under the totality of the circumstances. *Cheatham, supra* at 27. Furthermore, the analysis must be bifurcated, i.e., considering (1) whether the waiver was voluntary, and (2) whether the waiver was knowing and intelligent. *Daoud, supra* at 639. Whether a statement was voluntary is determined by examining police conduct, but the determination whether it was made knowingly and intelligently depends, in part, on the defendant's capacity. *People v Howard*, 226 Mich App 528, 538; 575 NW2d 16 (1997). Intoxication from alcohol or other substances can affect the validity of a waiver of Fifth Amendment rights, but is not dispositive. *People v Leighty*, 161 Mich App 565, 571; 411 NW2d 778 (1987).

Here, defendant challenges both the voluntariness of his waiver and whether his waiver was knowingly and intelligently made. This Court reviews de novo the question of voluntariness. *People v Sexton (After Remand)*, 461 Mich 746, 752; 609 NW2d 822 (2000). Similarly, this Court reviews de novo the entire record

to determine whether an accused has knowingly and intelligently waived his Fifth Amendment rights. *Cheatham, supra* at 30. However, deference is given to the trial court's assessment of the weight of the evidence and the credibility of the witnesses, *id.*, and the trial court's findings will not be reversed unless they are clearly erroneous and leave "this Court with a definite and firm conviction that a mistake was made." *People v Shipley,* 256 Mich App 367, 372-373; 662 NW2d 856 (2003).

As noted, defendant asserts that his waiver was involuntary on the bases of his intoxication and coercion by the police officers. In determining voluntariness, the court should consider all the circumstances, including: "[1] the age of the accused; [2] his lack of education or his intelligence level; [3] the extent of his previous experience with the police; [4] the repeated and prolonged nature of the questioning; [5] the length of the detention of the accused before he gave the statement in question; [6] the lack of any advice to the accused of his constitutional rights; [7] whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; [8] whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; [9] whether the accused was deprived of food, sleep, or medical attention; [10] whether the accused was physically abused; and [11] whether the suspect was threatened with abuse." *People v Cipriano,* 431 Mich 315, 334; 429 NW2d 781 (1988). No single factor is determinative. *Sexton, supra* at 753. "The ultimate test of admissibility is whether the totality of the circumstances surrounding the making of the confession indicates that it was freely and voluntarily made." *Cipriano, supra* at 334.

In concluding that defendant voluntarily waived his Fifth Amendment right, the trial court analyzed the

*Cipriano* factors and the evidence it found most credible. The facts found by the trial court had support in the record, and those findings do not compel a legal conclusion that defendant's intoxication or state of mind caused his waiver to be anything other than voluntary. Although evidence was presented that defendant was both suicidal and intoxicated at the time he gave his out-of-court statements, this evidence is far outweighed by the rest of the evidence presented. Defendant is a college-educated adult who has experience with the criminal justice system. He was not threatened, harmed, or denied any of the basic necessities he required, including medical care. He was twice advised of his rights. Although intoxicated, defendant was coherent and rational, he understood the questions posed to him and answered them appropriately, and he was able to assist officers in creating a written record of the interview. As noted, intoxication is only one of at least eleven factors to be considered in determining whether a defendant's waiver of his constitutional rights is voluntary, and no one factor is dispositive. *Sexton, supra* at 753. Assessing the totality of the circumstances, the trial court correctly determined that defendant's waiver of his Fifth Amendment right was voluntary.

We also agree with the trial court that defendant's waiver of his Fifth Amendment right was knowingly and intelligently made. To establish that a defendant's waiver of his Fifth Amendment right was knowingly and intelligently made, "the state must present evidence sufficient to demonstrate that the accused understood that he did not have to speak, that he had the right to the presence of counsel, and that the state could use what he said in a later trial against him." *Cheatham, supra* at 29. Moreover, a defendant " 'need not understand the ramifications and consequences' "

of waiving his right, *Daoud, supra* at 636 (citation deleted), and the test is not whether it was wise or smart to admit his culpability, *Cheatham, supra* at 29. Rather, a defendant need only know of his available options and make a rational decision, not necessarily the best decision. *Id.* at 28.

In the present case, the prosecutor presented evidence that on both occasions when he was read his rights, defendant acknowledged that he understand those rights and was willing to waive them and to speak with the police officers. The evidence showed that defendant never appeared to be confused, and several of the officers testified that defendant's intoxication did not interfere with his ability to understand and to answer the questions posed to him. Several of the officers also testified that defendant seemed rational and was not delusional during questioning. In light of this evidence, the trial court correctly found that defendant knowingly and intelligently waived his Fifth Amendment right.[6]

### v. SIXTH AMENDMENT RIGHT TO COUNSEL

Defendant also asserts that his out-of-court statements were inadmissible because they were made after he invoked his Sixth Amendment right to counsel. This argument similarly lacks merit. A criminal defendant has a constitutional right to counsel during interrogation. *Miranda, supra* at 444-445. When a defendant invokes his right to counsel, the police must terminate

---

[6] In any event, defendant's initial statement, "Just shoot me. I can't spend the rest of my life in prison. Let me kill myself," was an uncompelled statement made by defendant without questioning from the police. It was therefore admissible irrespective of whether he subsequently waived his Fifth Amendment right. *People v Raper*, 222 Mich App 475, 479; 563 NW2d 709 (1997).

their interrogation immediately and may not resume questioning until such counsel arrives. *Edwards v Arizona*, 451 US 477, 482; 101 S Ct 1880; 68 L Ed 2d 378 (1981). However, the defendant's invocation of his right to counsel must be unequivocal. *Davis v United States*, 512 US 452, 457; 114 S Ct 2350; 129 L Ed 2d 362 (1994). "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning." *Id.* at 459.

For example, in *Davis*, the Court held that a suspect's statement, "Maybe I should talk to a lawyer," was not sufficient to invoke his right to counsel and end questioning. *Davis, supra* at 462. In the present case, during questioning defendant twice brought up the subject of an attorney. In both instances, defendant either stated, "Maybe I should talk to an attorney," or "I might want to talk to an attorney." These statements are almost identical to the statement made by the defendant in *Davis*. Accordingly, we hold that defendant never properly invoked his constitutional right to counsel because his statements regarding counsel were not unequivocal demands. As a result, the trial court correctly concluded that, because defendant had not properly invoked his constitutional right to counsel, his out-of-court statements were not inadmissible on that ground.

### vi. EVIDENCE OF INTENT, PREMEDITATION, AND MALICE AFORETHOUGHT

In one of his pretrial motions, defendant sought a ruling allowing admission of certain expert testimonial evidence of intent, premeditation, and malice aforethought. The trial court denied defendant's motion,

reasoning that, pursuant to *People v Carpenter*, 464 Mich 223; 627 NW2d 276 (2001), the evidence was inadmissible. In making its ruling, the trial court explicitly left open to defendant the right to introduce evidence, not based on expert testimony, that defendant did not intend certain results of his acts.

Defendant now argues that the trial court committed an error requiring reversal in denying his motion. Claims of error regarding the admission of evidence are reviewed for an abuse of discretion. *People v Lukity*, 460 Mich 484, 488; 596 NW2d 607 (1999). An abuse of discretion exists only "when an unprejudiced person, considering the facts on which the trial court acted, would say that there was no justification or excuse for the ruling made." *People v Rice (On Remand)*, 235 Mich App 429, 439; 597 NW2d 843 (1999). However, decisions regarding the admission of evidence frequently involve preliminary questions of law, e.g., whether a rule of evidence or a statute precludes admissibility of the evidence. *Lukity, supra* at 488. Questions of law are reviewed de novo. *Id*. "[I]t is an abuse of discretion to admit evidence that is inadmissible as a matter of law." *Id*. "[A] preserved, nonconstitutional error is not a ground for reversal unless . . . it is more probable than not that the error was outcome determinative." *Id*. at 495-496.

In *Carpenter, supra* at 241, our Supreme Court ruled as follows:

> The Legislature has enacted a comprehensive statutory scheme setting forth the requirements for and the effects of asserting a defense based on either mental illness or mental retardation. We conclude that, in so doing, the Legislature has signified its intent not to allow evidence of a defendant's lack of mental capacity short of legal insanity to avoid or reduce criminal responsibility by negating specific intent. Rather, the insanity defense as established

by the Legislature is the sole standard for determining criminal responsibility as it relates to mental illness or retardation.

In effect, the *Carpenter* ruling removed diminished capacity as a viable defense. *People v Abraham*, 256 Mich App 265, 271 n 2; 662 NW2d 836 (2003).

The crux of defendant's argument here is that the Court's ruling in *Carpenter* was not binding because it was not necessary to the resolution of the case. Obiter dicta are defined as "[s]tatements and comments in an opinion concerning some rule of law or legal proposition not necessarily involved nor essential to determination of the case in hand . . . ." *Hett v Duffy*, 346 Mich 456, 461; 78 NW2d 284 (1956), overruled on other grounds *Weller v Mancha*, 353 Mich 189, 194 (1958). Dictum generally lacks precedential value. *Carr v City of Lansing*, 259 Mich App 376, 383-384; 674 NW2d 168 (2003).

In our view, the *Carpenter* ruling was not dictum. Not only was it essential to the determination of the case, it was the very basis of the Court's resolution of the case. As long as case law established by our Supreme Court remains valid, "this Court and all lower courts are bound by that authority." *Boyd v W G Wade Shows*, 443 Mich 515, 523; 505 NW2d 544 (1993). Accordingly, pursuant to *Carpenter*, the evidence defendant sought to introduce was inadmissible because defendant was not asserting an insanity defense.

Alternatively, defendant argues that even if the rule from *Carpenter* were not dictum, the trial court still erred in barring this evidence because, in doing so, the trial court prevented defendant from presenting a defense. However, as noted, the trial court barred defendant only from presenting evidence of his mental state to negate intent. The court left open to defendant the right to present lay testimony that he did not have the

requisite intent to commit the charged crimes. Indeed, defendant did so testify. Under these circumstances, the trial court's ruling did not deny defendant his constitutional right to present a defense; rather, it merely denied defendant the right to present evidence of diminished capacity.

### B. JURY INSTRUCTION

Defendant's final argument is that the trial court committed clear error when it refused to give the requested jury instruction on the necessarily included lesser offense of voluntary manslaughter, claiming there was evidence to support this charge. In doing so, defendant argues the court prevented him from asserting a defense and, thereby, denied him due process of law.

"This Court reviews de novo claims of instructional error." *People v Hall*, 249 Mich App 262, 269; 643 NW2d 253 (2002). To warrant reversal, a "defendant must show that it is more probable than not that the trial court's failure to give the requested instruction undermined the reliability of the verdict." *People v Lowery*, 258 Mich App 167, 172-173; 673 NW2d 107 (2003).

When a defendant is charged with murder, instructions for voluntary and involuntary manslaughter must be given if supported by a rational view of the evidence. *People v Mendoza*, 468 Mich 527, 541; 664 NW2d 685 (2003). To prove voluntary manslaughter, the prosecution must prove that: (1) the defendant killed in the heat of passion; (2) the passion was caused by adequate provocation; and (3) there was no lapse of time during which a reasonable person could have controlled his passions. *People v Sullivan*, 231 Mich App 510, 518; 586 NW2d 578 (1998), aff'd by equal division 461 Mich 992 (2000). The degree of provocation required to mitigate a

killing from murder to manslaughter "is that which causes the defendant to act out of passion rather than reason." *Id.* In order for the provocation to be adequate it must be "that which would cause a reasonable person to lose control." *Id.* (emphasis deleted). "The determination of what is reasonable provocation is a question of fact for the fact-finder." *Id.* However, "[w]here, as a matter of law, no reasonable jury could find that the provocation was adequate, the court may exclude evidence of the provocation." *Id.*

In the present case, trial testimony established that defendant had increasingly strong feelings for Paajanen, that he asked her to go out on dates several times, that he offered his assistance in any way desired on more than one occasion, and that he proposed to Paajanen on several occasions. Evidence was also presented that Paajanen declined defendant's requests for dates and was not interested in defendant, that she did not accept his offers for assistance or for marriage, and that she was frightened by defendant's ongoing interest in her. Further, defendant admitted that, although he had very strong feelings for Paajanen, the two of them never dated, kissed, held hands, or visited the other's home. Defendant testified repeatedly that he was unable to control his emotions. Looking at the evidence in totality, no reasonable jury could find that adequate provocation existed with respect to Paajanen. The events giving rise to defendant killing Paajanen were not such as would cause a reasonable person to lose control.

The evidence concerning any relationship between defendant and Fleck that would give rise to adequate provocation is nonexistent. Defendant himself stated that he did not recognize Fleck until Fleck stepped out of a truck at Paajanen's home, that he did not know

Fleck personally, and that he did not want anything from Fleck. Thus, no reasonable jury could find that adequate provocation existed with respect to Fleck.

Moreover, although defendant repeatedly asserted that he was enraged and did not cool off throughout the entire period between the time he saw Fleck and Paajanen kissing and the time he killed them, defendant also admitted that approximately nine hours passed between the time he saw the kiss and the time he shot them. Further, in order to kill Fleck and Paajanen, defendant drove nearly three hours to his parents' house and back to obtain the guns and ammunition. Thus, under these circumstances, no reasonable jury could find that there was no lapse of time during which a reasonable person could have controlled his passions.

Affirmed.