*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

RAUL PEREZ,

      Defendant-Appellant.

UNPUBLISHED
March 19, 2019

No. 340697
Kent Circuit Court
LC No. 16-011206-FC

Before: RIORDAN, P.J., and MARKEY and LETICA, JJ.

PER CURIAM.

Defendant, Raul Perez, appeals by right his jury conviction for first-degree murder, MCL 750.316(1)(a). The trial court sentenced Perez to life imprisonment without the possibility of parole. On appeal, Perez argues (1) that the trial court abused its discretion by allowing the prosecution to present evidence that Perez had given a false name to the police when he had been arrested for operating while intoxicated; (2) that insufficient evidence supported his jury conviction for first-degree murder; and (3) that the trial court plainly erred by admitting evidence of Perez's custodial interview. We find no merit in these contentions and affirm Perez's conviction and sentence.

## I. FACTUAL BACKGROUND

On October 25, 2016, Perez's daughter, Kimberly, arrived home from work sometime before 11:00 p.m. About 20 minutes later, Perez arrived intoxicated at Kimberly's apartment and asked her for a ride. While Kimberly prepared to leave, Perez began talking about "weird stuff," and said that if Kimberly "didn't see him the next day, he would be okay, not to worry about him." When Kimberly questioned Perez about what he meant, Perez said he was "going to go away and then take some people with him." He specifically mentioned Karla Magana, the

-1-

woman who he "was currently with."[1]  Kimberly testified that she did not take Perez's comments seriously because he was drunk and was "just talking nonsense."

Kimberly explained to the jury that Perez tried to call someone but that person would not answer.  When they were getting ready to leave, Perez's phone rang and he answered it.  Kimberly heard him say, "[H]ey, can I see you[?]" and "[M]y daughter will take me.  I'll be fine."  When they were on the road, Perez called someone again—Kimberly believed it was Magana, the same person as before.  Perez said, "I'm almost there," "Come outside," and "I love you."  They arrived at Magana's house, and Magana got into Kimberly's car.  Perez asked Kimberly to drive them back to the apartment complex where both Perez and Kimberly lived in separate apartments.  During the ride back, Perez and Magana were holding hands and kissing.

At around 4:00 or 5:00 a.m., Perez called Kimberly and said, "I just wanted to tell you I love you, and I'm sorry for not being there for you."  Kimberly asked Perez what he was talking about and whether he was still drinking.  Perez said, "I'm being serious, I love you, and just saying sorry for everything."  Perez then told Kimberly that he "did something really bad," and indicated that "he had killed the lady."  Kimberly assumed that Perez was still drunk and that he and Magana must have argued.  Perez said, "[J]ust know that I love you," and ended the phone call.  After seeing her father's suitcase in the hallway later that morning, Kimberly called the police.  Kimberly let the police into Perez's apartment with her spare key, and Magana's body was discovered in the bathroom.  Perez was passed out on his bed.

A neighbor who lived in the apartment above Perez's unit testified that around 1:15 a.m. she heard "[a] lot of screaming, banging, glass breaking, and thumping."  She remembered hearing both a male and a female voice, primarily speaking in Spanish.  Although the neighbor did not speak Spanish and could not understand everything she heard, it sounded as if the woman was being hurt.  The witness recalled that the female voice, speaking in English, screamed, "[W]hy are you doing this to me[?]"  The commotion "slowed down for a little while" at about 2:00 a.m., but then "picked back up again."  She said that there was "maybe about 15, 20 minutes of quiet" during the whole episode, which continued until approximately 3:00 or 3:30 a.m.

A forensic pathologist explained that Magana suffered multiple severe injuries and had been manually strangled to death.  He described several blunt-force injuries to her face as well as several sharp-force injuries, including to her nose and right hand.  Magana had defensive-type wounds on her hands.  The pathologist explained that manual strangulation requires "a significant amount of force being applied for several minutes[.]"  In his opinion, Magana would have passed out after approximately 20 seconds but may have regained consciousness if that force released and blood flow returned.  He estimated that it would probably take five minutes or longer for death to occur from manual strangulation.

_____

[1] Perez also named two former lovers, neither of whom he maintained contact with.

A detective interviewed Perez shortly after his arrest. Perez confessed to killing Magana using his hands and explained that he was jealous because she wanted to leave him for another man. Perez also admitted that Magana was aware that he had recently been arrested and released after giving the police a false name. Perez referred to this as a "problem" because he feared that she would go to the police and expose his deceit. In Perez's own words, Magana intended to end her relationship with Perez and threatened, "[I]f you don't leave me alone, I'm going to the police and tell who you really are."

## II. MRE 404(B)(1) OTHER-ACTS EVIDENCE

Perez first argues that the trial court abused its discretion by allowing the prosecution to present evidence under MRE 404(b)(1) that Perez was arrested for operating while intoxicated and that he gave a false name to police to secure his release. This Court reviews the trial court's evidentiary decisions for an abuse of discretion. *People v Danto*, 294 Mich App 596, 598-599; 822 NW2d 600 (2011). "A trial court abuses its discretion when its decision falls outside the range of principled outcomes." *Id*. at 599.

MRE 404(b)(1) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

In order for evidence to be admissible under MRE 404(b)(1), "(1) the evidence must be offered for a proper purpose; (2) the evidence must be relevant; and (3) the probative value of the evidence must not be substantially outweighed by [the danger of] unfair prejudice." *Danto*, 294 Mich App at 599 (quotation marks and citation omitted; alteration in original). This Court has described MRE 404(b)(1) as an *inclusionary* rule "because it provides a nonexhaustive list of reasons to properly admit evidence that may nonetheless also give rise to an inference about the defendant's character." *People v Mardlin*, 487 Mich 609, 616; 790 NW2d 607 (2010). "Evidence is *inadmissible* under this rule *only* if it is relevant *solely* to the defendant's character or criminal propensity." *Id*. at 615-616. Furthermore,

> [a]ll relevant evidence is prejudicial; only *unfairly* prejudicial evidence may be excluded. *People v McGhee*, 268 Mich App 600, 613-614; 709 NW2d 595 (2005). "Unfair prejudice exists when there is a tendency that evidence with little probative value will be given too much weight by the jury." *Id*. at 614. Unfair prejudice may arise where considerations extraneous to the merits of the case, such as jury bias, sympathy, anger, or shock, are injected. *Id*. [*Danto*, 294 Mich App at 600.]

"Proof of motive in a prosecution for murder, although not essential, is always relevant and evidence of other acts to prove motive is admissible under MRE 404(b)(1)." *People v Rice (On*

-3-

*Remand)*, 235 Mich App 429, 440; 597 NW2d 843 (1999) (citation omitted). The determination turns on whether "logical relevance is shown," i.e., "the existence of some intermediate fact, bridging the gap between that act and the charged act." *Id*.

Perez argues that there was "a firestorm of publicity" related to his case, making headlines across the country, because Perez killed Magana only a few days after the police arrested him for driving while intoxicated and released him under a false name. He brings to the Court's attention several news articles concerning the crime, including one that relates how then-candidate Donald Trump cited this particular case during his presidential campaign. Perez argues that his arrest was of marginal relevance to Magana's death and was substantially prejudicial given the "outrage" about "an illegal alien [being] let loose after drinking and driving, lying to the police about his identity and then killing a person."

We disagree. During his custodial interview,[2] Perez made several highly incriminating statements necessarily implicating the previous arrest. Perez admitted that Magana knew of the arrest and his subsequent release under a false name, which was a "problem." Perez himself linked the fact that Magana was leaving him for another man with her threat to expose his deceit to the police. In Perez's own words, Magana threatened Perez, stating, "[I]f you don't leave me alone, I'm going to the police and tell who you really are." Perez said that this threat made him feel "mad."

The prosecution offered this evidence for a proper purpose. Contrary to Perez's argument, his direct admissions concerning the underlying cause of the fight that ultimately led to Magana's death was highly probative evidence supporting a finding of premeditation and deliberation because it established a motive for Perez's actions. To the extent that this evidence had some tendency towards impugning Perez's character, *Mardlin* instructs that such evidence is inadmissible "*only* if it is relevant *solely* to the defendant's character or criminal propensity." *Mardlin*, 487 Mich at 616. In this case, the evidence supported the prosecution's theory, and motive for a homicide is always relevant. *Rice (On Remand)*, 235 Mich App at 440.

Nor was this evidence unfairly prejudicial. Although this case generated national attention during the throes of the 2016 presidential election campaign, that attention alone was not a reason to exclude such highly probative evidence about Perez's motive for killing Magana. The prosecution did not reference Perez's undocumented status or any statements made by presidential candidates or their surrogates and, instead, focused solely on Perez's own explanation for why he was "mad" and, resultantly, killed Magana. Moreover, the trial court properly provided a limiting instruction intended to alleviate any danger of unfair prejudice. We presume that the jury followed this instruction. *People v Roscoe*, 303 Mich App 633, 646; 846 NW2d 402 (2014).

---

[2] The jury watched a redacted version of the custodial interview video and reviewed a transcript of the interrogation.

III. SUFFICIENCY OF THE EVIDENCE

Next, Perez argues that the prosecution presented insufficient evidence to support his conviction. Again, we disagree.

"In determining whether sufficient evidence exists to sustain a conviction, this Court reviews the evidence in the light most favorable to the prosecution, and considers whether there was sufficient evidence to justify a rational trier of fact in finding guilt beyond a reasonable doubt." But more importantly, "[t]he standard of review is deferential: a reviewing court is *required* to draw all reasonable inferences and make credibility choices in support of the jury verdict. The scope of review is the same whether the evidence is direct or circumstantial. Circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime." "It is for the trier of fact, *not the appellate court*, to determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences." [*People v Oros*, 502 Mich 229, 239; 917 NW2d 559 (2018) (citations omitted; alteration in original).]

"In pertinent part, to secure a conviction of first-degree premeditated murder, the prosecution must establish beyond a reasonable doubt a '[m]urder perpetrated by means of poison, lying in wait, or any other willful, deliberate, and premeditated killing.' " *Id*. at 239-240 (alteration in original), quoting MCL 750.316(1)(a). "The elements of first-degree murder are (1) the intentional killing of a human (2) with premeditation and deliberation." *People v Bennett*, 290 Mich App 465, 472; 802 NW2d 627 (2010). As explained recently by our Supreme Court, the prosecution can prove first-degree murder with evidence that the defendant had an opportunity for a "second look" before killing the victim:

Premeditation and deliberation may be established by an interval of time between the initial homicidal thought and ultimate action, which would allow a reasonable person time to subject the nature of his or her action to a "second look." *People v Gonzalez*, 468 Mich 636, 641; 664 NW2d 159 (2003); *People v Tilley*, 405 Mich 38, 45; 273 NW2d 471 (1979). That is, "some time span between the initial homicidal intent and ultimate action is necessary to establish premeditation and deliberation," but it is within the province of the fact-finder to determine whether there was sufficient time for a reasonable person to subject his or her action to a second look. See *Gonzalez*, 468 Mich at 641 (quotation marks, brackets, and citation omitted). "While the minimum time necessary to exercise this process is incapable of exact determination," *Tilley*, 405 Mich at 45 (quotation marks and citation omitted), "[i]t is often said that premeditation and deliberation require only a 'brief moment of thought' or a 'matter of seconds,' " 2 LaFave, Substantive Criminal Law (3d ed), § 14.7(a), p 650 (citations omitted). "By the weight of authority the deliberation essential to establish murder in the first degree need not have existed for any particular length of time before the killing." 4 Blackstone, Commentaries on the Laws of England, p *195 n 14. "The time within which a wicked purpose is formed is immaterial, provided it is formed without disturbing excitement. The question of deliberation, when all the

-5-

circumstances appear, is one of plain common sense; and an intelligent jury can seldom be at a loss to determine it." *People v Holmes*, 111 Mich 364, 372; 69 NW 501 (1896) (quotation marks and citation omitted).

"The requisite state of mind may be inferred from defendant's conduct judged in light of the circumstances." [*People v*] *Hoffmeister*, 394 Mich [155,] 159[; 229 NW2d 305 (1975)]. In other words, what constitutes sufficient evidence to support the elements of premeditation and deliberation may vary from case to case because the factual circumstances will vary, but the ultimate answer may be resolved in determining whether reasonable inferences may be made to support the fact-finder's verdict. For example, in *People v Johnson*, 460 Mich 720, 733; 597 NW2d 73 (1999), this Court held that evidence of a struggle between the defendant and the victim can be evidence of premeditation and deliberation based on the defendant's opportunity to take a "second look." And this Court has also held that "[m]anual strangulation can be used as evidence that a defendant had an opportunity to take a 'second look.' " *Gonzalez*, 468 Mich at 641. But in *Hoffmeister*, this Court found that insufficient evidence existed to show premeditation and deliberation because, when the only evidence presented was the number of stab wounds, there was no basis for the jury to conclude that the defendant had adequate time for a "second look." *Hoffmeister*, 394 Mich at 159, 161. [*Oros*, 502 Mich at 242-244 (footnotes omitted; first and last alterations in original).]

There is ample evidence supporting Perez's conviction in this case. Perez made highly incriminating statements both before and after Magana's death. Before Magana's death, he suggested to his daughter that she should not worry if she did not see him the next day and that he was planning to take Magana with him. Afterward, Perez himself suggested a motive by acknowledging that Magana intended to leave him and threatened to tell the police that he had given them a false name after his recent arrest. Perez's neighbor testified that she overheard a heated altercation lasting several hours, during which she heard a female voice, presumably Magana, scream, "[W]hy are you doing this to me[?]" The neighbor also recalled a 15 to 20 minute period when the altercation seemed to ebb, which was plenty of time for Perez to have considered his next action. Finally, the forensic pathologist testified that some of Magana's injuries were consistent with a defensive struggle and that it could have taken approximately five minutes of applied force to actually cause death by manual strangulation. All of this evidence suggests that Perez had the opportunity for a "second look." Therefore, we conclude the evidence, considered in the light most favorable to the prosecution, was sufficient to uphold Perez's conviction.

## IV. WAIVER OF RIGHTS

Lastly, Perez argues that the trial court committed plain error by allowing the prosecution to introduce his custodial interview at trial. Perez claims that because he is a native Spanish speaker and was intoxicated at the time of the interview, he did not understand his *Miranda*[3] rights and, therefore, could not have voluntarily, knowingly, and intelligently waived those rights. We disagree.

Perez admits that he did not preserve this argument by raising it in the trial court. See *People v Dickinson*, 321 Mich App 1, 15; 909 NW2d 24 (2017). Because this claim of error is unpreserved, we review it only for plain error affecting Perez's substantial rights. *People v Pennington*, 323 Mich App 452, 457 n 2; 917 NW2d 720 (2018). "To satisfy the plain-error standard, a defendant must show (1) that an error occurred, (2) that the error was plain (i.e., it was clear or obvious), and (3) that the error affected his or her substantial rights (i.e., that it affected the outcome)." *Id*.

"A suspect's waiver of his *Miranda* rights must be made 'voluntarily, knowingly, and intelligently.' " *People v Tanner*, 496 Mich 199, 209; 853 NW2d 653 (2014), quoting *Miranda*, 384 US at 444. In *Tanner*, our Supreme Court recited the two-part inquiry necessary for determining whether a waiver was valid:

> First, the relinquishment of the right must have been "voluntary," in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived. [*Tanner*, 496 Mich at 209, quoting *Moran v Burbine*, 475 US 412, 421; 106 S Ct 1135; 89 L Ed 2d 410 (1986).]

Perez does not argue that the police utilized any intimidating, coercive, or deceptive tactics. Rather, Perez argues only that he did not understand the choice presented because of a language barrier and his intoxication. Accordingly, we consider the second part of the inquiry set forth in *Tanner* as to whether Perez's waiver was made with "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Tanner*, 496 Mich at 209.

In order to validly waive the right against compelled self-incrimination, the defendant need only have a "very basic understanding of those rights . . . ." *People v Eliason*, 300 Mich App 293, 304; 833 NW2d 357 (2013) (quotation marks and citation omitted). Stated differently, "the test is not whether it was wise or smart to admit . . . culpability." *People v Tierney*, 266 Mich App 687, 710; 703 NW2d 204 (2005). In *Tierney*, this Court agreed with the trial court

---

[3] *Miranda v Arizona*, 384 US 436, 444-449; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

that the defendant's waiver was knowingly and intelligently made because the defendant acknowledged his rights and was willing to speak with the police officers, did not appear to be confused, and several officers testified that the defendant's intoxication, although not precisely known, "did not interfere with his ability to understand and to answer the questions posed to him." *Id*.

There is no evidence clearly demonstrating that Perez did not understand the *Miranda* warning because of a language barrier. At the time of his arrest, Perez spoke to one of the arresting officers in English. He also responded appropriately to commands given in English. During the custodial interview, when asked whether he needed help understanding his rights, Perez responded, "I'm okay." Even so, the detective read Perez his rights a second time while permitting Perez to follow along on the written form and, again, Perez responded that he understood and signed the form indicating as much. Admittedly, there were moments during the interview when the detective struggled with Perez's accent, but Perez corrected any misunderstandings. Viewing the totality of the exchange, Perez fairly demonstrated his ability to speak and understand English. We are satisfied that Perez, although a native Spanish speaker, possessed a sufficient grasp of English to understand his rights.

Similarly, we recognize that "[i]ntoxication from alcohol or other substances can affect the validity of a waiver of Fifth Amendment rights, but is not dispositive." *Id*. at 707. Rather, whether the waiver was knowingly and intelligently given "depends, in part, on the defendant's capacity." *Id*. At trial, the evidence varied as to the degree of Perez's intoxication throughout the time period in question. However, there is no reason for this Court to conclude that Perez's intoxication affected his ability to understand his rights and freely waive them. Although it is undisputed that Perez was drunk the night before, it seems that his level of intoxication had largely dissipated by the time of his arrest the following morning. The detective who conducted the interview testified that he had no concerns that Perez was still drunk because Perez followed directions, did not stumble, did not slur his speech, was coherent, and was actively answering the detective's questions. Several other officers also observed that, although there was an odor of alcohol present, there were no overt signs that Perez was overly intoxicated and that he was able to follow instructions and move about under his own power without stumbling.

Even if we were to assume that the trial court erred by admitting evidence of Perez's custodial statement to police, we are satisfied that the trial's outcome would not have changed because of the significant amount of other incriminating evidence supporting the jury's verdict. It is not clear or obvious that any error occurred and, assuming an error did occur, Perez failed to demonstrate how the error affected the outcome of his trial. Thus, Perez cannot satisfy the plain-error standard. See *Pennington*, 323 Mich App at 457 n 2.

Affirmed.

/s/ Michael J. Riordan
/s/ Jane E. Markey
/s/ Anica Letica