# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

TERRILL IAN HARDAWAY,

        Defendant-Appellant.

UNPUBLISHED
August 4, 2016

No. 325941
Wayne Circuit Court
LC No. 14-003105-FC

Before: SHAPIRO, P.J., and HOEKSTRA and RONAYNE KRAUSE, JJ.

PER CURIAM.

On December 29, 2012, defendant Terrill Hardaway shot and killed Tony Jackson in the parking lot of the Four Winds Bar in Detroit, Michigan. He was charged with second-degree murder, MCL 750.317, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. At trial, defendant asserted that he shot Jackson in self-defense after Jackson approached him and shot him at point-blank range. The jury rejected defendant's claim of self-defense and acquitted him of murder, but convicted him of voluntary manslaughter, MCL 750.321, and felony-firearm. Defendant was sentenced to serve 3 to 15 years' imprisonment for the voluntary manslaughter conviction, consecutive to a two-year sentence for the felony-firearm conviction. For the reasons stated in this opinion, we affirm defendant's convictions, but remand for further proceedings in accordance with *People v Lockridge*, 498 Mich 358; 870 NW2d 502 (2015).

## I. FACTS

On December 20, 2012, nine days before the shooting, defendant got into a fight with Jackson. According to Jackson's fiancé, the fight arose after she challenged defendant for tapping her buttocks while she was in the bar area. He then followed her back to the DJ area, where Jackson was working as a DJ and an argument ensued. During the argument, defendant pushed Jackson to the floor and drew a loaded gun. Jackson's fiancé knocked the gun from defendant's hand and, while he and Jackson engaged in a fistfight, she picked the gun up and put it in her waistband. After the fight, defendant demanded the return of his gun, but it was not returned to him. The bar's owner testified that defendant stated something to Jackson like "I know you have my gun, this isn't over" before he left. Timothy Brown, a bar patron that helped break up the fight between defendant and Jackson, also testified that defendant stated "that's okay, I got two, two more guns." Finally, Jackson's fiancé testified that before leaving,

-1-

defendant yelled to her and Jackson "that's okay, I got three more guns" and "when I come back I'm killing you and your bitch." Jackson and his fiancé brought defendant's gun to the police station and reported the incident.[1]

On December 28, 2012, defendant returned to the bar in the early evening hours, but was advised over the phone by the bar's owner that Jackson was working that night and that she did not want him in the bar. Defendant left. At some point, he went to another bar, where he told Brown, the person that had broken up the December 20 fight, that he was still mad, but would get over it. Later that same night, defendant returned to the Four Winds Bar and approached Jackson, who was working. Their discussion escalated. Marcus Jones, one of Jackson's friends, testified that defendant drew a gun and pointed it at Jackson's head. Jones responded by striking defendant in the head with a bottle, causing the gun to go flying. Jones, Jackson, and defendant then engaged in a fight that was broken up by security. The security guard testified that when he stopped the fight, Jackson had a gun to defendant's head. The security guard testified that he took Jackson's gun even though Jackson asked him not to; however, he returned it after determining that it did not have a clip. Jackson then loaded his gun with a clip from his pocket.

Defendant demanded the return of two guns. The record reflects that Jones left the bar with one of the guns and turned it in to the police after the shooting. The second gun was given to an older bar patron named Danny McWilliams. Defendant and McWilliams left out the back door, which led into the parking lot. Jackson left the bar through the front door.

The events in the parking lot were captured by a multi-camera video surveillance system. Multiple witnesses also testified about their perception of the outside events. The following facts are clear. First, defendant was verbally and physically trying to get his gun back from McWilliams, who testified that he was concerned that if defendant got his gun back someone inside the bar might get hurt. Second, Jackson looked around a corner a few times and then approached defendant, McWilliams, and another bar patron, Antonio Hightower. When he did so, his gun was drawn and pointed level with McWilliams's head. Upon seeing the gun, McWilliams tried to get away, but defendant restrained him and continued tussling for his gun.

Defendant eventually got his gun back. According to the testimony and video evidence, Jackson shot defendant first.[2] Jackson then turned and ran away. There was evidence that he was still shooting at defendant while running away. Defendant, upon getting his gun back, fired multiple shots at Jackson. Hightower testified that defendant was shooting as if he were at the

---

[1] Contrary to defendant's argument that this testimony was irrelevant, we conclude that it was relevant. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. The fact that defendant initiated a fight, drew a gun on Jackson, and threatened to murder him several days before he shot and killed him made it more probable that when defendant went to the Four Winds Bar on December 28, 2012, he brought two loaded guns because he intended to kill Jackson.

[2] It was undisputed that defendant sustained a gunshot wound to his shoulder area.

firing range and knew what he was doing. The security guard testified that he saw defendant shoot his gun four times. McWilliams testified that he heard four or five shots from where he was hiding under a truck with his eyes closed.

The video shows that after firing, defendant went around a vehicle instead of directly pursuing Jackson. It also showed what appears to be a dark object moving across the video. The trial court allowed Detroit Police Sergeant Ron Gibson to testify that in his lay opinion, the dark object was a gun.[3] Regardless, the video depicts Jackson moving around the back of a burgundy van and then falling. It also shows defendant firing a second series of shots. There was also testimony that after firing the second series of shots, defendant told Jackson "got you now bitch." The entire incident lasted nine seconds from when Jackson shot defendant until Jackson fell following the second series of shots fired by defendant.

The forensic pathologist testified that Jackson sustained five gunshot wounds, two of which were to his back. She opined that one of the gunshot wounds in Jackson's back was fatal, and that he would have fallen and died within seconds after sustaining it. She also opined that the abrasions on Jackson's face were caused by a terminal fall, i.e. a fall where he did not brace himself.

## II. DIRECTED VERDICT

Defendant first argues that the trial court erred when it refused to direct a verdict of not guilty.[4] He argues that, at the least, the charge of second-degree murder should not have been submitted. We disagree.

First, there was sufficient evidence to submit the charge of second-degree murder to the jury. The elements of second-degree murder are: "(1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse." *People v Reese*, 491 Mich 127, 143; 815 NW2d 85 (2012), quoting *People v Goecke*, 457 Mich 442, 464; 579 NW2d 868 (1998). "Malice is defined as the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and wilful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *Goecke*, 457 Mich at 464. Defendant shot Jackson multiple times, and there was evidence that Jackson was unarmed when the fatal shot was fired into his back. There was also evidence that after Jackson fell, defendant said "got you

---

[3] Gibson was admitted as an expert forensic video technician and analyst; however, the trial court did not allow him to offer an expert opinion on whether the dark object was a gun or something else. Gibson testified that he was unable to determine, with scientific certainty, whether the object was a gun.

[4] We review "de novo a trial court's denial of a motion for directed verdict[.]" *Abke v Vandenberg*, 239 Mich App 359, 361; 608 NW2d 73 (2000). In doing so, "we view the evidence, as well as any legitimate inferences, in the light most favorable to the nonmoving party and decide whether a factual question exists about which reasonable minds might have differed." *Id*.

now bitch." Further, before the encounter in the parking lot, defendant had twice pulled a loaded gun on Jackson and had once threatened to kill him. Viewed in the light most favorable to the prosecution, this evidence was sufficient for the jury to conclude that defendant was acting with malice when he shot and killed Jackson.

There was also sufficient evidence to support submitting the voluntary manslaughter charge to the jury. The elements of voluntary manslaughter are: "(1) the defendant killed in the heat of passion; (2) the passion was caused by adequate provocation; and (3) there was no lapse of time during which a reasonable person could have controlled his passions." *People v Tierney*, 266 Mich App 687, 714; 703 NW2d 204 (2005). There was evidence that defendant had been shot and that, within a nine-second interval, he retaliated by shooting Jackson five times, including two shots to his back. This evidence was sufficient to support a verdict on voluntary manslaughter.

Thus, the real question is whether there was sufficient evidence to establish beyond a reasonable doubt that defendant was not acting in lawful self-defense. The right to defend against a sudden and potentially deadly attack is "fundamental." *People v Dupree*, 284 Mich App 89, 104; 771 NW2d 470 (2009) (opinion by M. J. KELLY, J.). "[T]he killing of another person in self-defense is justifiable homicide only if the defendant honestly and reasonably believes his life is in imminent danger or that there is a threat of serious bodily harm and that it is necessary to exercise deadly force to prevent such harm to himself." *People v Riddle*, 467 Mich 116, 127; 649 NW2d 30 (2002). Further, a defendant has no duty to retreat "from a sudden, fierce, and violent attack; nor is he required to retreat from an attacker who he reasonably believes is about to use a deadly weapon." *Id*. at 119. Under those circumstances, a defendant may use deadly force in self-defense "as long as he honestly and reasonably believes that it is necessary to exercise deadly force in self-defense[.]" *Id*. In *Riddle*, the Court noted that a person defending himself from "an infuriated and reckless assailant" cannot "be required when hard pressed, to draw very fine distinctions concerning the extent of the injury that an infuriated and reckless assailant may probably inflict." *Id*. at 130 (quotation omitted). However, "the touchstone of *any* claim of self-defense, as a justification for homicide, is *necessity*." *Id*. at 127 (emphasis in original). A defendant is not entitled to use more force than necessary. *People v Kemp*, 202 Mich App 318, 322; 508 NW2d 184 (1993), abrogated on other grounds in *Reese*, 491 Mich 127.

The evidence in this case was sufficient to allow the jury to conclude that defendant used more force than necessary. Although Jackson shot defendant first, the video and testimony showed that Jackson then ran away and was chased by defendant. There was testimony supporting an inference that Jackson had dropped his gun before defendant fired the fatal shot. In particular, multiple witnesses testified that after the shooting they saw the gun between the front and rear tires of the burgundy van. Jackson's gun, which was recovered after the shooting, was also damaged so that it could only be fired by manually loading the cartridges. A police officer opined that the damage could have been caused by a bullet from another gun. The forensic pathologist also testified that Jackson sustained three gunshot wounds to his hand. Further, the jury was free to watch the video and determine whether a dark object moving across the screen for a part of the video was Jackson's gun or something else. Viewing these facts in the light most favorable to the prosecution, the jury could have concluded that when defendant fired the second set of shots, he shot an unarmed man in the back while he was running away.

Thus, there was sufficient evidence to support the jury's decision to reject defendant's self-defense claim and the trial court did not err in denying defendant's motion for a directed verdict.

### III. GREAT WEIGHT OF THE EVIDENCE

Defendant next argues that his conviction was against the great weight of the evidence.[5] We disagree.

A new trial may be granted if a jury's verdict is against the great weight of the evidence, but only if the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand. *People v Lemmon*, 456 Mich 625, 627, 635; 576 NW2d 129 (1998). "Conflicting testimony and questions of witness credibility are generally insufficient grounds for granting a new trial." *People v Unger*, 278 Mich App 210, 232; 749 NW2d 272 (2008). "Generally, a verdict may be vacated only when the evidence does not reasonably support it and it was more likely the result of causes outside the record, such as passion, prejudice, sympathy, or some other extraneous influence." *People v Lacalamita*, 286 Mich App 467, 469; 780 NW2d 311 (2009). "[U]nless it can be said that directly contradictory testimony was so far impeached that it was deprived of all probative value or that the jury could not believe it, or contradicted indisputable physical facts or defied physical realities, the trial court must defer to the jury's determination." *People v Musser*, 259 Mich App 215, 219; 673 NW2d 800 (2003) (citations and quotation marks omitted; alteration in original).

Defendant's argument appears to be that the video and testimony so clearly depicted that he was acting in self-defense that it would be a miscarriage of justice to allow the verdict to stand. In particular, he asserts that the fact that he moved around a vehicle instead of directly pursuing Jackson is only consistent with a fear of being shot, which shows that he was acting in self-defense. Further, he argues that the video shows that Jackson ambushed him in a dark parking lot and shot him at point blank range, and that his retaliation in the following nine-seconds was plainly self-defense. However, as discussed above, there was also substantial evidence consistent with a conclusion that defendant was no longer acting in self-defense. Viewing the video, the jury could conclude that Jackson dropped his gun before defendant fired the second series of shots. There was also evidence that Jackson sustained three gunshot wounds to his hand, and that his gun was damaged, possibly by a bullet from another gun. Moreover, there was evidence that Jackson's gun was located between the front and rear tires on the passenger side of a burgundy van, but his body fell near the back tires on the driver's side of the same van. As such, the jury could infer that defendant fired shots at an unarmed defendant. Next, there was testimony that after firing the second series of shots, defendant said "got you

---

[5] This issue is preserved because defendant moved for a new trial, arguing that the jury's verdict was against the great weight of the evidence. See *People v Johnson*, 128 Mich App 618, 622; 341 NW2d 160 (1983). "This Court reviews for an abuse of discretion the trial court's decision to grant or deny a motion for new trial." *People v Powell*, 303 Mich App 271, 276-277; 842 NW2d 538 (2013). An abuse of discretion occurs when the decision results in an outcome outside the range of reasonable and principled outcomes. *Id*. at 277.

now bitch" to Jackson. And finally, the forensic pathologist testified that Jackson was shot two times in the back, and that one of those wounds was fatal. This evidence was not so far impeached that it was deprived of all probative value, nor did it contradict indisputable physical facts or defined physical realities. See *Musser*, 259 Mich App at 219. On this record, the evidence does not preponderate so heavily against the jury's verdict that it would be a miscarriage of justice to allow it to stand.

## IV. OPINION EVIDENCE

Defendant next challenges the trial court's decision to allow Sergeant Gibson to testify to lay and expert opinions. He asserts that the bifurcation of Gibson's opinion testimony was confusing to the jury and prejudicial to the defense. The jury, however, was instructed multiple times throughout the trial as to the limits of Gibson's expert testimony. In particular, the jury was instructed that all of Gibson's testimony as to what he saw on the video was to be considered a lay opinion only. Gibson made the distinction between his lay and expert opinion testimony clearer during direct and cross examination when he acknowledged multiple times that he was unable to offer an expert opinion as to whether the dark object was a gun, but that in his lay opinion based on watching the video he believed it was a gun. Given that the differences in opinion were clearly demarcated by the jury instructions and the testimony, and given the absence of indications of jury confusion, we find no error in the court's general decision to allow a single witness to offer expert and lay opinion testimony.

However, assuming *arguendo* that the trial court abused its discretion when it allowed Gibson to offer a lay opinion that the dark object moving in the video was Jackson's gun, we do not find the erroneous admission of his testimony to constitute reversible error. "[A] preserved, nonconstitutional error is not a ground for reversal unless after an examination of the entire cause, it shall affirmatively appear that it is more probable than not that the error was outcome determinative." *People v Lukity*, 460 Mich 484, 495-496; 596 NW2d 607 (1999) (quotation marks omitted); see also MCL 769.26. Whether the gun fell was a factual determination. The jury was instructed that it had the duty to determine what was on the video. Further, in addition to being able to review the video and the still-image photographs, the jury also heard testimony from multiple witnesses that suggested Jackson's gun, right after the shooting, was located on the passenger side of the burgundy van, somewhere between the front and rear tire, whereas Jackson's body was located near the back tires on the driver's side of the same van. There was also testimony that Jackson's right hand sustained three gunshot wounds and that his gun had also been damaged, possibly by a bullet from another gun. As such, independent of Gibson's testimony, the jury had evidence on which it could conclude that Jackson dropped the gun before defendant fired the second series of shots. The jury also viewed the video numerous times in both regular and slow motion throughout the trial and, because it was introduced as an exhibit, they could view it additional times after they began their deliberations. Thus, after review of the entire case, we cannot conclude that it was more probable than not that the error in admitting Gibson's testimony was outcome determinative, and defendant is not entitled to reversal.

We also conclude that any error in allowing Gibson to offer testimony regarding a series of blurry photographs of Jackson's gun was not outcome determinative. First, the value of the blurred photographs was effectively impeached by the defense expert's testimony regarding the different conditions between the blurred photographs and the still-image photographs from the

video. Second, Gibson's report containing the blurred photographs was admitted into evidence, and in that report, he indicated that even with the aid of the blurry photographs he could not say with any scientific certainty that the object in the still-image photographs from the video was Jackson's gun. In other words, it was plain from the evidence that the blurred photographs did not make any fact of consequence more probable or less probable. Additionally, the jury was able to view the images in the video and draw their own conclusions, based not only upon the images, but also upon the testimony from multiple eyewitnesses to the shooting. Based on that evidence, the jury could determine that Jackson's gun either fell from his hand or was shot from his hand while he was on the passenger-side of the burgundy van, but that he was fatally shot when he was on the other side of that same vehicle. For these reasons, the admission of the photographs was not reversible error.

## V. JURY INSTRUCTIONS

Defendant next argues that the trial court committed reversible error when it instructed the jury about the duty of an initial aggressor to withdraw in order to be entitled to use self-defense.[6] We disagree.

The trial court allowed the initial aggressor instruction because the prosecutor's theory was that the shooting was continued from the altercation inside. That is, defendant was the initial aggressor because he pulled a gun on Jackson in the bar and he never communicated that he was withdrawing to Jackson. According to the prosecution's theory, when Jackson went outside he could hear defendant struggling to get his gun back from McWilliams and so he went around the corner with his gun drawn because he was afraid that defendant was going to get his gun back and come after him again. The prosecutor's theory is supported by McWilliams's testimony that he did not want to give defendant his gun back because he was concerned defendant would go back inside and someone would get hurt. McWilliams also testified that defendant was asking for and trying to get his gun back and that Jackson should have been able to hear what was happening and what was being said from where he was at the corner. It is also supported by testimony that when Jackson approached he asked defendant something like "why don't you just go" and said that he did not want to be doing what he was doing. Thus, although some witnesses testified that the fight inside was over, a jury could conclude that the fight from inside, which was started by defendant pulling a gun on Jackson for the second time within a nine-day period, was continuing outside given that defendant did not communicate his intent to withdraw and was still arguably trying to re-arm himself to go back inside. Accordingly, under

---

[6] "Claims of instructional error are generally reviewed de novo by this Court, but the trial court's determination that a jury instruction is applicable to the facts of the case is reviewed for an abuse of discretion." *People v Dobek*, 274 Mich App 58, 82; 732 NW2d 546 (2007). "This Court reviews jury instructions in their entirety to determine whether there is error requiring reversal." *People v Gonzalez*, 256 Mich App 212, 225; 663 NW2d 499 (2003). "We will not reverse a conviction if the instructions fairly presented the issues to be tried and sufficiently protected the defendant's rights." *Id*.

the prosecutor's theory, which was supported by some evidence, defendant did not have the right to use self-defense when he shot Jackson because of his failure to withdraw.

The trial court's instructions made it plain that the jury could find that defendant had the right to use self-defense even if he was the initial aggressor if he had genuinely stopped fighting.[7] And contrary to the evidence supporting the prosecutor's position, defendant solicited testimony that the fight inside was over. Accordingly, the jury had to make a choice between conflicting evidence, and the question of withdrawal was properly submitted to the jury to determine.

Defendant also challenges the propriety of the duty to retreat instruction. He argues that he clearly had no duty to retreat because the video showed that he was faced with an armed attacker, who came up to him in the dark and shot him. See *Riddle*, 467 Mich at 119 (a defendant has no duty to retreat from "a sudden, fierce, and violent attack" and has no duty to retreat "from an attacker who he reasonable believe is about to use a deadly weapon"). However, even assuming that the duty to retreat instruction was not necessary in this case, we do not find the trial court's decision to give it to the jury to be reversible error.

The instruction in this case is similar to the instruction given in *People v Richardson*, 490 Mich 115; 803 NW2d 302 (2011). In that case, our Supreme Court held that the trial court did not err when it instructed the jury on the duty to retreat even though the duty to retreat did not apply because the defendant was in his home when he fired at and injured two people. *Id*. at 117-119. The Court noted that while "[a]n instruction that omitted the general duty to retreat and informed the jury only that defendant had no duty to retreat might have been clearer," the defendant was not prejudiced because "the jury was, in fact, informed that person attacked in his or her home has no duty to retreat." *Id*. at 120-121. Similarly, in this case, defendant cannot show prejudice from the trial court's instruction on the duty to retreat because the jury was told that a person confronted with an armed attacker or a person faced with a sudden and fierce attack had no duty to retreat. Although the omission of the jury instruction on the duty to retreat would have been clearer, the failure to omit the instruction is not reversible error.

---

[7] The trial court instructed:

> A person who started an assault on someone else with deadly force or with a dangerous or deadly weapon cannot claim that he acted in self-defense unless he genuinely stopped fighting or clearly let the other person know he wanted to make peace. Then if the other person kept on fighting or started fighting again later, defendant had the right to defend himself as anyone else and produce force to save himself from immediately physical harm.

## VI. MOTION FOR MISTRIAL

Defendant next argues that the trial court abused its discretion when it denied his request for a mistrial following two notes from the jury indicating that they were at an impasse.[8] We disagree.

"A mistrial is warranted only when an error or irregularity in the proceedings prejudices the defendant and impairs his ability to get a fair trial." *People v Waclawski*, 286 Mich App 634, 708; 780 NW2d 321 (2009) (citations and quotation marks omitted). Furthermore, "[a] mistrial should be granted only where the error complained of is so egregious that the prejudicial effect can be removed in no other way." *People v Gonzales*, 193 Mich App 263, 266; 483 NW2d 458 (1992). A trial court may grant a mistrial because of jury deadlock. *Arizona v Washington*, 434 US 497, 509; 98 S Ct 824; 54 L Ed 2d 717 (1978). When a jury indicates that it is unable to agree unanimously on a verdict, a court may require the jury to continue deliberations so long as the court's instructions or actions do not require or threaten to require the jury to deliberate for an unreasonable length of time or for unreasonable intervals, or cause "a juror to abandon his conscientious dissent and defer to the majority solely for the sake of reaching agreement." See *People v Hardin*, 421 Mich 296, 316; 365 NW2d 101 (1984).

In this case, the jury deliberations were neither protracted nor exhaustive. The first jury note was sent on the second day of deliberations. The tenor of the jury's note was not that it was hopelessly deadlocked, but that it needed direction on how to proceed. It read "We are not able to agree on the self-defense verdict. Any new ideas?" The court then informed the jury:

> We have a jury instruction that is designed to try and assist you in terms of giving you some further direction when you're unable to reach a verdict.
>
> I'm hopeful that it'll give you some ideas in terms of how you might continue your deliberations.
>
> I'm going to read you that additional jury instruction and then I'm going to ask you to go back in the jury room and resume your deliberations.
>
> I also want to let you know that I've decided that I'm just going to keep you here today till 3 and then, I don't want to keep you till 4 because you've been deliberating all day, and it's a grind. I know that. And so what I'll do is I'll have you stay till 3 and if you haven't reached a verdict then I'll just have you go home over the weekend and come back fresh on Monday morning and resume, okay?

---

[8] We review for an abuse of discretion a trial court's decision on a motion for mistrial. *People v Lane*, 308 Mich App 38, 60; 862 NW2d 446 (2014). Reversal of a trial court's decision on a motion for a mistrial "is not warranted unless the defendant makes an affirmative showing of prejudice resulting from the abuse of discretion." *People v Vettese*, 195 Mich App 235, 246; 489 NW2d 514 (1992).

Here's the 3.12 jury instruction. You've returned from deliberation indicating that you believe you cannot reach a verdict.

I'm going to ask you to please return to the jury room and resume your deliberations in the hope that after further discussion you'll be able to reach a verdict.

As you deliberate, please keep in mind the guidelines I gave you earlier. Remember it's your duty to consult with your fellow jurors and try to reach agreement if you can do so without violating your own judgment.

To return a verdict you must all agree on the verdict. It must represent the judgment of each of you.

As you deliberate, you should carefully and seriously consider the views of your fellow jurors. Talk things over in a spirit of frankness and fairness. Naturally there will be differences of opinion. You should not, you should each not only express your opinion but also give the facts and reasons on which you base it.

By reasoning the matter out, jurors can often reach agreement.

If you think it would be helpful, you may submit to the deputy sheriff a list of issues that are dividing or confusing you. It will then be submitted to me. I will attempt to clarify or amplify the instructions in order to assist you in your further deliberations.

When you continue your deliberations, do not hesitate to re-think your own views and change your opinion if you decide it was wrong. However, none of you should give up your honest beliefs about the weight or effect of the evidence only because of what your fellow jurors think or only for the sake of reaching agreement.

Okay, so I hope that provides some help and guidance. I'm going to ask the jurors to go back to the jury room and resume your deliberations at this time.

Nothing in the court's remarks and instructions implied that the jury had to deliberate for any specific period of time, return a verdict in a certain amount of time, or that it had to return a unanimous verdict contrary to their honest beliefs. Further, at that point, the jury had only been deliberating for about a half a day on Thursday and about half a day on Friday.

Less than two hours after sending the first note, the jury sent a second impasse note and defense counsel requested a mistrial. The trial court denied the request, concluding that the trial had been lengthy, there was a significant quantity of evidence, and it was reasonable to require the jury to return and deliberate on Monday. The court then again instructed the jury in accordance with 3.12, prefacing the standard instruction with the following comments:

I recognize that this is a hardship for you and that you've tried to make it clear to me that, where things stand. But I am going to excuse you for the day and ask you to come back again on Monday. And I know that is difficult for you, but I'm going, and part of the reason for doing that is we spent a long time on this trial. There was a lot of effort that was put into this, and so I think it's in our best interest to go home this weekend, clear your mind, and then come back and try again with a fresh start on Monday morning, okay?

Nothing in the instructions submitted following the court's second deadlock instruction suggested that the jury was required to reach a verdict, only that they should continue their attempts to reach a verdict on Monday. At that point, considering the length of the trial and the close nature of the proofs, it was reasonable for the court to conclude that the jury had not exhausted all efforts to fully consider and resolve the differing views of the jurors. Accordingly, despite the two notes from the jury indicating that they were at an impasse, the record in this case does not suggest that the trial court abused its discretion in denying defendant's request for a mistrial.

## VII. PROSECUTORIAL MISCONDUCT

Defendant next argues that the prosecutor engaged in prosecutorial misconduct by making arguments unsupported by the evidence and by appealing to the jury's sympathy and bias.

The test of prosecutorial misconduct "is whether a defendant was denied a fair and impartial trial." *Dobek*, 274 Mich App at 63. Prosecutorial misconduct issues are decided "on a case-by-case basis," and the reviewing court must examine the record and evaluate a prosecutor's remarks in context. *People v Mann*, 288 Mich App 114, 119; 792 NW2d 53 (2010). "The propriety of a prosecutor's remarks depends on all the facts of the case." *People v Rodriguez*, 251 Mich App 10, 30; 650 NW2d 96 (2002).

Defendant first asserts that the prosecutor committed misconduct during closing argument when she argued:

What if somebody who's a killer, somebody intent on killing somebody, what does he do? *Chases somebody around a car, chases him around the back of the car, shoots him when they're down on the ground.* [Emphasis added.]

The prosecutor continued by arguing that the shell casings recovered from the scene showed where defendant was standing when he fired the second shots. Further, she argued that the forensic pathologist testified that the fatal gunshot entered Jackson's back "from left to right and upward" and that, based on the positions shown in the video, the only way that the bullet would enter that way was if defendant came around the van and shot him from a crouching position. She also argued that it "happened behind that van when he had him down on the ground and this coward sitting here shot an unarmed man in the back. That's what happened."

"A prosecutor may not make a statement of fact to the jury that is not supported by evidence presented at trial and may not argue the effect of testimony that was not entered into evidence." *Unger*, 278 Mich App at 241. However, a prosecutor may argue all reasonable

inferences from the evidence and need not limit her arguments to the blandest terms possible. *Dobek*, 274 Mich App at 66. Here, the prosecutor's argument is plainly based on the evidence introduced: the video, the location where the shell casings were recovered and the testimony about how far they may have traveled, and the forensic pathologist's testimony.[9] Accordingly, although no one directly testified that defendant shot Jackson while he was on the ground, the jury was free to view the evidence and draw that conclusion.

Next, defendant argues that the prosecutor committed misconduct when she argued that the bar owner was afraid of defendant's temper. During closing argument the prosecutor argued:

> The owner told you, "He's a fireman. I didn't feel I can tell him, 'You can't go behind the bar and make a drink.' I didn't feel I could tell him not to do anything."

> Did you hear her say that she didn't want her bartender to tell [defendant] that he couldn't stay in the bar? Do you remember that, that testimony? Because she was afraid of [defendant's] temper. She didn't want to have that bartender deal with [defendant.]

Defense counsel objected, asserting that the owner never said anything about defendant's temper, and the court stated "[t]hat's true, there was no evidence offered regarding the owner saying anything about his temper." The prosecutor stated that she recalled such testimony, but said "obviously the judge will tell you what I say is not evidence. What counsel says is not evidence." She then stated:

> My recollection of the evidence is when I asked her, "Why didn't you have your bartender tell him he couldn't stay?" Her answer was, "I didn't want to have my bartender deal with [defendant's] temper." That's my recollection of what that evidence was.

> If I'm wrong, then obviously that's for the court, that's for you guys to decide. But that's what I recall the evidence being.

The court then immediately instructed the jury:

> And I'll just reinforce that. What the lawyers say here is not evidence. Only what you heard from the witness stand is evidence, and you have to make a determination. In a 2 week trial they're doing their best to recount what they believe the evidence shows, okay?

---

[9] Defendant's argument is essentially that, in his view, the video evidence plainly showed that defendant did not shoot Jackson once he realized he was on the ground and no longer posed a threat. However, the jury was free to watch the video and draw its own conclusions, thereby accepting, rejecting, or accepting in part and rejecting in part, the arguments by both defendant and the prosecutor.

-12-

At trial, the owner testified that on December 28, 2012, after she told defendant to leave the bar, he said:

> Something, like, you don't want me to come in the bar anymore? Something like—And his, his tone changed and at that point I didn't want to say any more because I wasn't there; and the only one there was my barmaid and I didn't think she should have to deal with [it] if he got angry or an attitude. So I just kind of said I want you to leave now and I don't want you to come to the bar tonight when Tony's there.

Although she did not testify that she was afraid of defendant's temper, that was a reasonable inference that could be drawn from the evidence given that she discontinued the conversation because she did not want her barmaid to have to deal with defendant if he became angry. Accordingly, there was no error with the prosecutor's comment. Moreover, even if the prosecutor committed misconduct, defendant's timely objection and the court's instructions were sufficient to cure the error.

Defendant also challenges the prosecutor's statement that defendant was a "hothead." Immediately following the preceding argument, the prosecutor asserted: "you've seen evidence in this trial about the defendant being a hothead." This argument was not improper. There was testimony that on December 20, 2012, defendant pushed Jackson to the ground and drew a gun following a discussion about Jackson's fiancé. After the fight, defendant demanded the return of his gun. When he did not get it back, he threatened to return with multiple guns and said he was going to kill Jackson and his fiancé. Eight days later, when he returned to the bar and was told to leave, his tone changed and the bar's owner discontinued the conversation because she was concerned about him getting angry. There was also testimony that he told Brown he was still angry about the December 20 fight. There was evidence that he returned to the bar despite being told not to, engaged in conversation with Jackson, pulled a gun on him again, and again engaged in a fistfight that had to be broken up by others. There was also testimony that he was upset after that fight was over and that he was again demanding the return of his guns. Finally, McWilliams testified that he was concerned that if he gave defendant his gun back, he might injure someone inside the bar. Defendant's state of mind was relevant to the charges and the defense. Given these facts, the prosecutor did not commit misconduct in arguing that defendant was a hothead.

Finally, defendant asserts that the prosecutor committed misconduct during rebuttal when she argued:

> I know, ladies and gentlemen, that you take your responsibility seriously and I know that you'll listen to the judge's instructions, and when the defense talks about you know the defendant and his family, you've got an entire row of family here missing their loved one because of the act of this defendant.

A prosecutor may not appeal to the jury's sympathy. *People v Watson*, 245 Mich App 572, 591; 629 NW2d 411 (2001). The challenged comments plainly appeal to the jury's sympathy. The prosecutor asserts that the comments were responsive to defendant's arguments and, in any event, they were true. The fact that the comment was true is of no regard, but otherwise improper prosecutorial conduct does not necessarily mandate reversal if the comments address

issues raised by defense counsel. See *People v Jones*, 468 Mich 345, 353; 662 NW2d 376 (2003). During closing argument, defense counsel argued that the case was "definitely serious to [defendant] and his family. The most serious day of his life." Defense counsel also thanked the jury on behalf of defendant and his family. Thus, in context, the prosecutor's comment was at the end of a two-week trial, was relatively brief and isolated, and was arguably in response to defense counsel's references to the trial's importance to defendant and his family. Further, the jury was instructed not to let sympathy or prejudice affect its decision and that it must return a verdict based only upon the evidence and the trial court's instructions on the law. Jurors are presumed to follow their instructions. *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998). Thus, the instruction alleviated any minimal prejudice caused by the comment.

## VIII. SENTENCING

Defendant next argues that he is entitled to resentencing because the trial court engaged in improper judicial fact-finding when it scored offense variable (OV) 5. The prosecution concedes that the trial court engaged in improper judicial fact-finding, but contends that a *Crosby*[10] remand is required, not a remand for resentencing. We agree with the prosecution.

In *Lockridge*, our Supreme Court held that the legislative sentencing guidelines were unconstitutional to the extent that they "*require* judicial fact-finding beyond facts admitted by the defendant or found by the jury to score offense variables (OVs) that *mandatorily* increase the floor of the guidelines minimum sentence range[.]" *Lockridge*, 498 Mich at 464 (emphasis in original). Accordingly, the Court severed MCL 769.34(2) to the extent that it made the sentencing guidelines mandatory on the basis of facts found by the judge rather than facts found by the jury or admitted by the defendant. *Id*. The Court also severed MCL 769.34(3)'s requirement that the trial court articulate substantial and compelling reasons before imposing a departure sentence. *Id*. at 364-365. The sentencing guidelines are now advisory, although the sentencing court must still determine the applicable range and take it into account when imposing a sentence. *Id*. at 365.

In this case, the trial court scored OV 5 at 15 points. OV 5 must be scored at 15 points if "[s]erious psychological injury requiring professional treatment occurred to a victim's family." MCL 777.35(1)(a). Defendant did not admit to causing Jackson's family serious psychological injury requiring professional treatment, nor was the jury required to find that fact as a part of its deliberations. Accordingly, as conceded by the prosecution, the trial court engaged in judicial fact-finding.

Although defendant requested a remand for resentencing, the *Lockridge* Court held that if a defendant's sentence was constrained in violation of the Sixth Amendment, then this Court should remand for a *Crosby* proceeding. See *Lockridge*, 498 Mich at 398. Defendant was at OV Level VI, with a minimum guidelines range of 29 to 57 months. A reduction of 15 points would place him in OV Level V, with a minimum guidelines range of 19 to 38 months. Thus, his

---

[10] *United States v Crosby*, 397 F3d 103 (CA 2, 2005).

sentence was constrained by judicial fact-finding in violation of the Sixth Amendment and he is entitled to a *Crosby* remand.[11]

Defendant also argues that the trial court erred by not finding substantial and compelling reasons to depart downward. We disagree.

Before the decision in *Lockridge*,[12] MCL 769.34(3) provided that a sentencing court "*may* depart from the appropriate sentence range established under the sentencing guidelines . . . if the court has a substantial and compelling reason for that departure and states on the record the reasons for the departure." (Emphasis added). Thus, the decision to depart was within the court's discretion. In this case, despite defendant's argument in favor of a downward departure and the prosecution's argument in favor of an upward departure, the trial court chose to impose a sentence within the guidelines range. Although defendant argues that decision was in error, there is no caselaw mandating that under certain facts a court *must* depart downward (or *must* depart upward). Rather, the decision, even if there are substantial and compelling reasons supporting a departure sentence, is left to the sound discretion of the sentencing court. In this case, the court explained:

> I don't find under the circumstances that it would be fair or appropriate that there's been any—notwithstanding all of the wonderful things that [defendant] has done, I don't find that there's a substantial or compelling basis for a deviation either upward or downward from the guidelines.
>
> I do find that the guidelines that have been established at 29 to 57 months are the appropriate guidelines under these circumstances. There is a responsibility that the Court has when there's been a finding of guilty on a voluntary manslaughter, when someone has lost their life, to fashion an appropriate sentence

---

[11] On a *Crosby* remand:

> a trial court should first allow a defendant an opportunity to inform the court that he or she will not seek resentencing. If notification is not received in a timely manner, the court (1) should obtain the views of counsel in some form, (2) may but is not required to hold a hearing on the matter, and (3) need not have the defendant present when it decides whether to resentence the defendant, but (4) must have the defendant present . . . if it decides to resentence the defendant. Further, in determining whether the court would have imposed a materially different sentence but for the unconstitutional constraint, the court should consider only the circumstances existing at the time of the original sentence. [*Lockridge*, 498 Mich at 398 (internal quotation marks and citation omitted).]

[12] See *Lockridge*, 498 Mich at 464-465 (striking down the requirement in MCL 769.34(3) that a sentencing court articulate substantial and compelling reasons before departing form the sentencing guidelines range).

and in this case, I think the guidelines have it correct in terms of the kind of incarceration that's required under these circumstances.

That decision was within the range of principled outcomes and did not constitute an abuse of discretion.

## IX. CUMULATIVE ERROR

Defendant finally argues that the cumulative effect of the errors mandates reversal of his conviction.[13] "The cumulative effect of several errors can constitute sufficient prejudice to warrant reversal even when any one of the errors alone would not merit reversal, but the cumulative effect of the errors must undermine the confidence in the reliability of the verdict before a new trial is granted." *Dobek*, 274 Mich App at 106. Reversal is not warranted in this case because even assuming that it was error for the court to admit the series of blurry photographs of Jackson's gun and to allow Gibson to offer opinion testimony that the dark object in the video was a gun, defendant was not denied a fair trial.

## X. CONCLUSION

For the foregoing reasons, we affirm defendant's conviction and remand to the trial court for *Crosby* proceedings in accordance with the procedure set forth in *Lockridge*, 498 Mich at 398. We do not retain jurisdiction.

/s/ Douglas B. Shapiro
/s/ Joel P. Hoekstra
/s/ Amy Ronayne Krause

---

[13] We review a claim of cumulative error to determine whether the combination of alleged errors denied the defendant a fair trial. *Dobek*, 274 Mich App at 106.