# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

LAKESHIA TULANI PEETE, also known as
LAKESHA TULANI PEETE,

        Defendant-Appellant.

UNPUBLISHED
October 12, 2017


No. 331568
Wayne Circuit Court
LC No. 14-004861-02-FC

_____

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DAIJA DENISE GATEWOOD,

        Defendant-Appellant.

No. 332006
Wayne Circuit Court
LC No. 14-004862-01-FC

_____

Before: SHAPIRO, P.J., and HOEKSTRA and M. J. KELLY, JJ.

PER CURIAM.

Defendants, Lakeshia Peete ("Peete") and her daughter, Daija Gatewood ("Gatewood"), were each charged with first-degree felony murder, MCL 750.316(1)(b), and torture, MCL 750.85. Defendants were tried jointly, before separate juries. Peete was found not guilty of felony murder and torture, but convicted of the lesser offense of assault with intent to do great bodily harm less than murder (AWIGBH), MCL 750.84. Gatewood was convicted of second-degree murder, MCL 750.317, and torture. The trial court sentenced Peete to 80 months to 10 years' imprisonment for her assault conviction, and sentenced Gatewood to prison terms of 7 to 20 years for each of her convictions, to be served concurrently. Peete appeals as of right in Docket No. 331568, and Gatewood appeals as of right in Docket No. 332006. For the reasons explained in this opinion, we affirm in both appeals.

Defendants' convictions arise from the beating and shooting death of Laquita Logan ("Logan"), who had been living with the Peete family, but was suspected of being involved in

-1-

the murder of Peete's husband, Kenneth Peete ("Kenneth"), who was killed during a home invasion in August 2013. On August 9, 2013, shortly after Kenneth's death, Peete, Gatewood, and Kenneth's son, Kenjuan Peete ("Kenjuan"), confronted Logan about her suspected involvement in Kenneth's homicide. The group took Logan to a bedroom in Peete's home and assaulted her in an effort to get her to confess about her role in Kenneth's death. Logan was later brought to the basement, where the interrogation and assault continued, and then escalated when several other men arrived at the house and joined in assaulting Logan. One of those men, Mario Johnson, eventually shot Logan in the head. The men thereafter removed Logan's body and dumped it inside an abandoned building, where it was discovered the next day. The medical examiner opined that the cause of death was "a gunshot wound to the head" and "blunt force impact."[1]

## I. DISQUALIFICATION OF JUDGE MORROW

Both defendants argue that a new trial is required because the chief judge erred in disqualifying the original assigned judge, Bruce Morrow, from presiding over the cases. We review an order granting the disqualification of a trial judge for an abuse of discretion. *Czuprynski v Bay Circuit Judge*, 166 Mich App 118, 124; 420 NW2d 141 (1988). The trial court's application of the law to the facts when deciding a motion to disqualify is reviewed de novo. *People v Wade*, 283 Mich App 462, 469; 771 NW2d 447 (2009).

The prosecutor sought to disqualify Judge Morrow because of his ex parte contacts with the officer in charge of the case and the appearance of impropriety those contacts created. MCR 2.003(C)(1)(b)(*ii*) provides that disqualification of a judge is warranted when the judge, "based on objective and reasonable perceptions, . . . has failed to adhere to the appearance of impropriety standard set forth in Canon 2 of the Michigan Code of Judicial Conduct." The Code of Judicial Conduct, Canon 2(A), provides that "[a] judge must avoid all impropriety and appearance of impropriety." The Code of Judicial Conduct, Canon 3(A)(4), also provides that "[a] judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties concerning a pending or impending proceeding." Exceptions to that rule include the following:

> (a) A judge may allow ex parte communications for scheduling, administrative purposes, or emergencies that do not deal with substantive matters or issues on the merits, provided:

---

[1] Several other individuals were also charged in connection with Logan's death. Kenjuan pleaded guilty to AWIGBH pursuant to an agreement whereby he agreed to testify against Peete and Gatewood and he received a sentence of 5 to 10 years' imprisonment. Mario Johnson pleaded guilty to second-degree murder and felony-firearm, MCL 750.227b. Johnson was sentenced to 23 to 35 years in prison for the murder conviction and a consecutive two years' imprisonment for felony-firearm. Danny Preston pleaded guilty to accessory after the fact, MCL 750.505, and was sentenced to 2-1/2 to 5 years in prison. Jamall Ayers pleaded no contest to felonious assault, MCL 750.82, and AWIGBH. Ayers was sentenced to 2 to 10 years in prison for the AWIGBH conviction and two to four years for the felonious assault conviction.

(*i*) the judge reasonably believes that no party or counsel for a party will gain a procedural or tactical advantage as a result of the ex parte communication, and

(*ii*) the judge makes provision promptly to notify all other parties and counsel for parties of the substance of the ex parte communication and allows an opportunity to respond.

The chief judge granted the prosecutor's motion to disqualify Judge Morrow, finding that his communications with the officer in charge were not for scheduling, administrative, or emergency reasons, but instead involved substantive communications about the case, establishing a violation of the Code of Judicial Conduct, Canon 3(A)(4).

We conclude that the chief judge did not err in granting the prosecutor's motion to disqualify Judge Morrow. Judge Morrow's contacts with the officer in charge involved inquiries about evidence that had been collected in the case and the status of the police investigation. These contacts were not merely administrative; they concerned substantive evidence in the case. Defendants argue that the contacts occurred with the consent of the prosecutor, thereby indicating that the prosecutor did not deem the contact improper. However, while Judge Morrow stated that he would make an "inquiry," he indicated that the phone call would be made by his clerk. And, in any event, at most, the prosecutor agreed to Judge Morrow, or his clerk, contacting the officer in charge to determine if defendants' cell phones could be returned. Even if such limited contact was permissible in light of the prosecutor's agreement, Judge Morrow exceeded the scope of this intended inquiry by asking for the investigator's report and requesting the evidence tag numbers for the cell phones. Judge Morrow's conduct also created an appearance of impropriety to support his disqualification under MCR 2.003(C)(1)(b)(*ii*) and the Code of Judicial Conduct, Canon 2(A). By contacting the officer in charge and making inquiries about potential evidence that went beyond ascertaining whether the evidence could be returned, Judge Morrow's conduct reflected poorly on his role as a neutral arbitrator of the facts. Accordingly, the chief judge did not abuse his discretion in finding that the nature and scope of the contacts justified Judge Morrow's disqualification.[2]

## II. DISCOVERY

---

[2] We also disagree with defendants' arguments that the prosecutor's motion to disqualify Judge Morrow amounted to improper judge shopping. The motion was based on objective events related to Judge Morrow's contacts with the officer in charge. Moreover, after Judge Morrow was disqualified, the case was reassigned by lot in accordance with MCR 8.111(C)(1). See *People v Montrose (After Remand)*, 201 Mich App 378, 380 n 1; 506 NW2d 565 (1993). There has been no suggestion that the judge who heard the case was biased or prejudiced, and defendants have not demonstrated any prejudice from the reassignment. See *People v McCline*, 442 Mich 127, 134; 499 NW2d 341 (1993); *Armco Steel Corp v Dep't of Treasury*, 111 Mich App 426, 439; 315 NW2d 158 (1981).

Next, both defendants argue that the trial court erred by refusing to allow full discovery of the police file related to Kenneth's murder investigation. The trial court refused to allow discovery of the entire file because the investigation was ongoing. However, the court did require the prosecutor to produce any exculpatory information and other information relevant to defendants' cases. In particular, the prosecutor produced a photograph of the Peete household that was taken during Kenneth's murder investigation, which depicted a bedsheet that appeared to match a sheet that was found at the location where Logan's body was recovered. The court also ordered production of the identity of the officer who photographed the bed sheet and any police reports or notes relating to that bedsheet. The court further ordered the prosecutor to review the police file to determine the existence of any exculpatory information, including information that would be useful for cross-examination. The prosecutor reviewed the file and informed the court that it did not contain any such information. On appeal, defendants argue that because of the connection between Kenneth's murder investigation and the instant cases, they were entitled to full discovery of the police file in Kenneth's case.

Discovery in criminal cases is left to the discretion of the trial court. *People v Lemcool*, 445 Mich 491, 497; 518 NW2d 437 (1994). See also MCR 6.201(J). A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *People v Schaw*, 288 Mich App 231, 236; 791 NW2d 743 (2010).

MCR 6.201(B)(2) provides that "[u]pon request, the prosecuting attorney must provide each defendant" with "any police report and interrogation records concerning the case, except so much of a report as concerns a continuing investigation." MCR 6.201(B)(1) also provides that the prosecutor must provide to the defendant "any exculpatory information or evidence known to the prosecuting attorney." MCR 6.201(B)(2) supports the trial court's decision to limit production of the police file related to Kenneth's murder investigation because that investigation was a continuing, ongoing investigation. The court was careful to balance the rights of the public and defendants by precluding production of the entire police file because of the possibility that it could jeopardize an ongoing investigation, while at the same time requiring production of information that was exculpatory to defendants or shown to be relevant to defendants' prosecutions.

We note that MCR 6.201(B)(1) incorporates the prosecutor's duty to turn over potentially exculpatory information. The trial court recognized defendants' entitlement to any such information and ordered the prosecutor to review the open murder file regarding Kenneth's death to determine if there was any potentially exculpatory information that might assist defendants, including information useful for impeachment. The prosecutor advised the court that Kenneth's file contained a photograph of a bedsheet in the Peete household that matched the bedsheet found with Logan's body, which would be introduced at trial. Otherwise, there was nothing in that file that was of relevance to this case or that would assist defendants. In particular, there were no statements or references to the victim in that file. There was no reason for the trial court to disbelieve the representations of the prosecutor as an officer of the court bound by a duty of candor. See *People v Garland*, 286 Mich App 1, 8; 777 NW2d 732 (2009).

Defendants argue that the trial court should have conducted an in-camera review of Kenneth's murder file to determine for itself if it contained any information that was relevant or would be useful to defendants, but a trial court is not obligated to conduct an in-camera review

hearing unless a defendant first demonstrates "a good-faith belief, grounded in articulable fact, that there is a reasonable probability that records protected by privilege are likely to contain material information necessary to the defense." MCR 6.201(C)(2). In this case, the trial court ordered production of information from Kenneth's murder file that might possibly be relevant to this case. That information included a photograph of the Peete household that depicted a bedsheet that appeared to be a match for the bedsheet that was discovered with Logan's body. The photograph was provided to defendants. Defendants also requested an opportunity to discover the name of the officer who took the photograph, and to review any police reports or notes relating to the photograph or bedsheet. The trial court ordered the prosecutor to provide that information to defendants. Defendants did not establish a reasonable probability that the file for Kenneth's open murder investigation contained any other information, not disclosed, that might be material to their defense, and thus there was no reason for in-camera inspection.

Defendants also argue that the trial court's failure to order full discovery of the police file for Kenneth's murder investigation violated their Sixth Amendment right of confrontation. Because defendants did not raise this argument in the trial court, it is unpreserved and review is limited to plain error affecting defendants' substantial rights. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999). The Confrontation Clause, US Const, Am VI, guarantees a defendant the reasonable opportunity to test the truth of a witness's testimony. *People v Slovinski*, 166 Mich App 158, 169-170; 420 NW2d 145 (1988). Defendants had the opportunity to confront the witnesses against them at trial. Defendants do not explain how production of Kenneth's murder investigation file was necessary to protect their right of confrontation. Defendants have not demonstrated that the trial court's ruling violated their rights under the Sixth Amendment.

## III. LESSER INCLUDED OFFENSES

Both defendants also argue that the trial court erred in denying their requests for jury instructions on the offenses of simple assault and aggravated assault, as lesser offenses to torture.

Preliminarily, we disagree with the prosecutor's position that defendants abandoned this claim of error by expressing satisfaction with the trial court's jury instructions as given. A claim of instructional error will be deemed abandoned when a defense attorney expresses satisfaction with the trial court's jury instructions. *People v Kowalski*, 489 Mich 488, 503; 803 NW2d 200 (2011). In this case, however, both defendants expressed satisfaction with the court's instructions, "subject to our earlier discussion." The record discloses that both defendants requested instructions on the lesser offenses of simple assault and aggravated assault. The trial court agreed to rule on those requests the next day. The matter was not addressed on the record the next day, but the record indicates that the parties and the court discussed the jury instructions that day, presumably in chambers. In light of this record, and the fact that the attorneys' approval of the jury instructions was expressly made "subject to our earlier discussion," we cannot conclude that the record clearly demonstrates an affirmative approval of the trial court's failure to instruct the jury on simple assault and aggravated assault. Therefore, we decline to consider this issue waived.

Nevertheless, we do not believe that reversal is required due to the failure to include either lesser included instruction. In *People v Mitchell*, 301 Mich App 282, 286; 835 NW2d 615 (2013), this Court explained:

> "We review a claim of instructional error involving a question of law de novo, but we review the trial court's determination that a jury instruction applies to the facts of the case for an abuse of discretion." *People v Dupree,* 486 Mich 693, 702; 788 NW2d 399 (2010). However, not all instructional error warrants reversal. Reversal is warranted only if " 'after an examination of the entire cause, it shall affirmatively appear' that it is more probable than not that the error was outcome determinative." *People v Lukity,* 460 Mich 484, 495-496; 596 NW2d 607 (1999), quoting MCL 769.26. "[T]he effect of the error is evaluated by assessing it in the context of the untainted evidence to determine whether it is more probable than not that a different outcome would have resulted without the error." *Lukity,* 460 Mich at 495. The verdict is undermined when the evidence clearly supports the requested lesser included instruction that was not given to the jury. *People v Cornell,* 466 Mich 335, 365; 646 NW2d 127 (2002).

A defendant is entitled to a lesser offense instruction only if the lesser offense is necessarily included in the greater offense; that is, the offense must be committed as part of the greater offense insofar as it would be "impossible to commit the greater offense without first committing the lesser offense." *Cornell*, 466 Mich at 354, 361. Instruction on cognate lesser offenses is not permitted. *Id.* at 353-355. A cognate lesser offense is one that shares some common elements with, and is of the same class as, the greater offense, but also has elements not found in the greater. *People v Wilder*, 485 Mich 35, 41; 780 NW2d 265 (2010). "[A] requested instruction on a necessarily included lesser offense is proper if the charged greater offense requires the jury to find a disputed factual element that is not part of the lesser included offense and a rational view of the evidence would support it." *Cornell*, 466 Mich at 357.

Aggravated assault is not a necessarily included lesser offense of torture. To prove torture, the prosecution must prove that (1) the defendant intended to cause cruel or extreme physical or mental pain and suffering, (2) the defendant inflicted great bodily injury or severe mental pain or suffering upon another person, and (3) the victim was within the defendant's custody or physical control. MCL 750.85. See also *Schaw*, 288 Mich App at 233-234. Aggravated assault occurs when a person "assaults an individual without a weapon and inflicts serious or aggravated injury upon that individual without intending to commit murder or to inflict great bodily harm less than murder . . . ." MCL 750.81a(1). Because aggravated assault requires a "serious or aggravated injury" and torture can be committed without actually inflicting a bodily injury, aggravated assault is not a necessarily included lesser offense of torture. Therefore, the trial court did not err by failing to instruct the jury on aggravated assault.

A simple assault is "an attempt to commit a battery or an unlawful act that places another in reasonable apprehension of receiving an immediate battery." *People v Meissner*, 294 Mich App 438, 453-454; 812 NW2d 37 (2011) (citation and quotation marks omitted). "A battery is an intentional, unconsented and harmful or offensive touching of the person of another. . . ." *Id.* at 454 (citation and quotation marks omitted). To the extent that assault constitutes a necessarily

included lesser offense of torture, the trial court's failure to instruct on that offense does not require reversal.

In Peete's case, a rational view of the evidence did not support an instruction on simple assault. The defense theory at trial was that Peete did not participate in the assaultive conduct against Logan, either as a principal or an aider or abettor. She claimed that it was Kenjuan who instigated the assaults and that she left the home when she saw what was happening because she did not want to be a part of it. Conversely, the prosecution presented evidence that Peete was involved from the beginning and participated in assaulting Logan, both in the bedroom upstairs and after she was moved to the basement, and the prosecutor argued that Peete actively supported the assaultive conduct inflicted by other participants. The contested issues at trial required the jury to determine Peete's involvement in the ongoing assaultive conduct directed against Logan, as a direct principal and an aider or abettor. Considering the severity of the assaultive conduct, a rational view of the evidence did not support a finding that Peete's involvement, if any, was limited to a simple assault. Therefore, the trial court did not err by refusing to instruct Peete's jury on simple assault.

The facts of Gatewood's case differ from those in Peete's case because Gatewood admitted her participation in the assault against Logan, but she placed the primary blame on Kenjuan and the other men. Thus, her involvement was not contested, and the jury was required to determine the level of her involvement. But to the extent that a rational view of the evidence would have supported an instruction on simple assault for Gatewood, failure to give that instruction was harmless error. Gatewood's jury convicted her of second-degree murder and torture and, in doing so, rejected the option of finding her guilty of the lesser offense of AWIGBH. In light of the jury's rejection of this intermediate lesser offense, any error in failing to instruct on simple assault does not undermine the reliability of the verdict in Gatewood's case, rendering any error harmless. *Cornell*, 466 Mich at 365 n 19.

## IV. SCORING OF THE SENTENCING GUIDELINES

Peete argues that she is entitled to resentencing because the trial court erred in scoring offense variables (OVs) 3, 7, and 14. We disagree.

In *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013), our Supreme Court explained:

> Under the sentencing guidelines, the circuit court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence. Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo. [Footnotes omitted.]

Peete argues that the trial court erred in assessing 50 points for OV 7, which, at the time the offense was committed, authorized a 50-point score when "[a] victim was treated with sadism, torture, or excessive brutality, or conduct designed to substantially increase the fear and anxiety a victim suffered during the offense." MCL 777.37(1)(a).[3] "For OV 7, only the defendant's actual participation should be scored." *People v Hunt*, 290 Mich App 317, 326; 810 NW2d 588 (2010). For instance, in *Hunt*, "while [the] defendant was present and armed during the commission of the crimes . . . he did not himself commit, take part in, or encourage others to commit acts constituting 'sadism, torture, or excessive brutality' under OV 7." *Id.* at 325-326. In this case, the trial court determined that 50 points should be assessed because the victim was treated with both excessive brutality and conduct designed to substantially increase the fear and anxiety she suffered during the offense. Peete argues that 50 points should not have been scored because any excessive brutality was inflicted by others.

The evidence showed that Logan was assaulted over a span of a couple of hours. Kenjuan testified that when Logan was initially confronted about her suspected involvement in Kenneth's death, Peete was present and struck Logan while she was in the upstairs bedroom. Although Peete left the house when Logan was taken to the basement, Peete later returned and participated in the continued questioning of Logan. By that time, other men had arrived and began to assault Logan in the face. According to Kenjuan, Peete was not only present during these assaults, Peete questioned Logan and actually struck Logan three or four times. Peete's step-daughter testified that she heard Peete admit that she "beat" Logan.

A preponderance of the evidence clearly showed that Logan was treated with excessive brutality. Even if Peete did not personally inflict the most serious injuries, her continued participation in the protracted assault of Logan demonstrate her encouragement and complicity in the excessive brutality directed against Logan, and the evidence supported a finding that the continued assaultive conduct was intended to substantially increase Logan's fear and anxiety in order to get her to provide information. Accordingly, the trial court did not clearly erred in assessing 50 points for OV 7.

Peete also challenges the trial court's assessment of 100 points for OV 3. MCL 777.33 provides, in relevant part:

> (1) Offense variable 3 is physical injury to a victim. Score offense variable 3 by determining which of the following apply and by assigning the number of points attributable to the one that has the highest number of points:
>
> (a) A victim was killed                                    100 points
>
> * * *

---

[3] MCL 769.34(2) requires the trial court to apply the version of the guidelines "in effect on the date the crime was committed." MCL 777.37(1)(a) was amended by 2015 PA 137, effective January 5, 2016, to add the words "similarly egregious" before the word "conduct."

(2) All of the following apply to scoring offense variable 3:

\* \* \*

       (b) Score 100 points if death results from the commission of a crime and homicide is not the sentencing offense.

Peete argues that 100 points should not have been assessed for OV 3 because she was acquitted of murder and convicted only of assault with intent to do great bodily harm. However, while there may have been more immediate causes of Logan's death, the fact remains that Logan would not have been killed but for the interrogation and assault in which Peete participated. See *People v Laidler*, 491 Mich 339, 344-346; 817 NW2d 517 (2012). Moreover, the medical examiner testified that Logan's bodily injuries from the assault contributed to her death. The trial court properly assessed 100 points for OV 3.

Peete next argues that the evidence did not support a finding that she was a leader in this offense, and therefore, the trial court erred in assessing 10 points for OV 14. The instructions for OV 14 provide that 10 points are to be scored where "[t]he offender was a leader in a multiple offender situation." MCL 777.44(1)(a). For purposes of this variable, the term "leader" is interpreted according to its ordinary dictionary definition as follows:

> According to *Random House Webster's College Dictionary* (2001), a "leader" is defined in relevant part as "a person or thing that leads" or "a guiding or directing head, as of an army or political group." To "lead" is defined in relevant part as, in general, guiding, preceding, showing the way, directing, or conducting. [*People v Rhodes (On Remand)*, 305 Mich App 85, 90; 849 NW2d 417 (2014).]

Under MCL 777.44(2) the trial court is required to consider "[t]he entire criminal transaction . . . when scoring this variable" and, "[i]f 3 or more offenders were involved, more than 1 offender may be determined to have been a leader."

In this case, Peete argues that Kenjuan was the leader. Although Kenjuan may have instigated the incident, because more than three offenders were involved, the trial court could find that more than one offender was a leader. The evidence showed that Peete was instrumental in pursuing the prolonged assault of Logan to learn whether she was involved in Kenneth's death. The assault was carried out at Peete's home, and Peete approvingly permitted the participation of her daughter, Gatewood, in the assault. In addition, Peete participated in the discussions about what to do with Logan and, according to Kenjuan, Peete rejected a suggestion that Logan be taken to the police so that she could confess her participation in Kenneth's homicide because Peete was concerned that they would be charged with assaulting Logan. Logan was shot shortly afterward. This evidence supports that Peete had a prominent role in the offense. Considering "[t]he entire criminal transaction," as the trial court was required to do, the trial court did not clearly err in finding that Peete was a leader in this multiple offender situation, even if there were others who also could be considered a leader. Accordingly, OV 14 was properly scored at 10 points.

## V. PEETE'S DEPARTURE SENTENCE

Peete also argues that the trial court abused its discretion by departing from the sentencing guidelines range of 10 to 23 months and imposing a sentence of 80 months to 10 years' imprisonment for Peete's conviction of AWIGBH. "A sentence that departs from the applicable guidelines range will be reviewed by an appellate court for reasonableness." *People v Lockridge*, 498 Mich 358, 392; 870 NW2d 502 (2015). This Court reviews the reasonableness of a trial court's departure sentence for an abuse of discretion, applying the principle-of-proportionality test. *People v Steanhouse*, ___ Mich ___; ___ NW2d ___ (2017) (Docket Nos. 152671, 152849, 152871-152873, 152946-152948); slip op at 14-15. That test requires a court to impose a sentence that is proportionate to the seriousness of the circumstances surrounding the offense and the offender. *Id.* at ___; slip op at 3. Factors to be considered include, but are not limited to:

> (1) the seriousness of the offense; (2) factors that were inadequately considered by the guidelines; and (3) factors not considered by the guidelines, such as the relationship between the victim and the aggressor, the defendant's misconduct while in custody, the defendant's expressions of remorse, and the defendant's potential for rehabilitation. [*People v Walden*, 319 Mich App 344, __; __ NW2d __ (2017); slip op at 5 (citation omitted).]

In this case, the trial court found that the guidelines did not adequately reflect the seriousness of this offense considering the brutal, vicious, and prolonged beating suffered by Logan at the hands of Peete and her codefendants. Peete was one of the persons who initiated the crime, she allowed it to be carried out inside her home by her guests, and she either personally participated in or supported the events that occurred over the following hours. Peete also allowed her children to participate in the beating. Logan was shot by one of the codefendants after a discussion in which Peete participated, and after Peete rejected a suggestion that they contact the police about Logan's involvement in Kenneth's homicide because she was concerned about being charged with assaulting Logan. The trial court also characterized Peete's conduct as particularly callous given that Logan was someone Peete had taken into her home and considered a sister, and yet Peete allowed Logan's body to remain in the morgue unidentified after it was discovered, and Peete attempted to cover up the crime when interviewed by the police. In addition, while Peete was on bond for this case, she incurred an additional charge for embezzlement, for which she was convicted. The trial court also found it noteworthy that Peete's total OV score of 185 points was more than double the 75 points necessary to place her in the highest category of offense severity, thereby indicating that the guidelines range did not adequately reflect the seriousness of the offense. Given the seriousness of the circumstances surrounding the offense and the offender, including circumstances not adequately accounted for by the guidelines, the trial court's sentencing decision satisfied the principle of proportionality and it was thus reasonable under *Lockridge*.

## VI. VOLUNTARINESS OF GATEWOOD'S STATEMENT

Finally, Gatewood argues that the trial court erred in denying her motion to suppress her police statement on the ground that it was not voluntary. This Court reviews de novo the question of voluntariness. *People v Tierney,* 266 Mich App 687, 707; 703 NW2d 204 (2005). However, deference is given to the trial court's factual findings, and those findings will not be

disturbed unless they are clearly erroneous. *People v Kowalski,* 230 Mich App 464, 471-472; 584 NW2d 613 (1998).

Whether a defendant's statement was voluntary is determined by examining the conduct of the police. *Tierney,* 266 Mich App at 707. "[T]he voluntariness prong cannot be resolved in defendant's favor absent evidence of police coercion or misconduct." *People v Howard,* 226 Mich App 528, 543; 575 NW2d 16 (1997).

> In determining voluntariness, the court should consider all the circumstances, including: "[1] the age of the accused; [2] his lack of education or his intelligence level; [3] the extent of his previous experience with the police; [4] the repeated and prolonged nature of the questioning; [5] the length of the detention of the accused before he gave the statement in question; [6] the lack of any advice to the accused of his constitutional rights; [7] whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; [8] whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; [9] whether the accused was deprived of food, sleep, or medical attention; [10] whether the accused was physically abused; and [11] whether the suspect was threatened with abuse." *People v Cipriano,* 431 Mich 315, 334; 429 NW2d 781 (1988). No single factor is determinative. . . . "The ultimate test of admissibility is whether the totality of the circumstances surrounding the making of the confession indicates that it was freely and voluntarily made." [*Tierney,* 266 Mich App at 708.]

In this case, Gatewood was 18-years-old and pursuing a college degree. Before speaking with the police, Gatewood was advised of her constitutional rights, she signed an advice of rights form, and she expressed her understanding of those rights. There is no indication that Gatewood was physically abused or threatened by the police. Further, Gatewood was not injured, intoxicated or drugged, or in ill health when she gave her statement. The police inquired about Gatewood's physical condition before questioning her, Gatewood had water to drink during the interview, and there is no evidence that she was denied food or medical attention.

Although Gatewood emphasizes that she was held in the interview room for approximately four hours, the recording reveals that the interview did not last four hours. Indeed, Gatewood made incriminating statements after about two hours. While the interview occurred late at night, she did not tell the police that she was tired or that she did not wish to continue. Moreover, Gatewood appeared composed and articulate while talking to the police. Overall, considering the totality of the circumstances, it does not appear that the length of the interview, or its timing, rendered Gatewood's statement involuntary.

Gatewood has not shown that the totality of the circumstances surrounding her interview establish that her statement was involuntary or coerced. Thus, the trial court did not err in denying her motion to suppress her statement.

Affirmed.

/s/ Douglas B. Shapiro
/s/ Joel P. Hoekstra
/s/ Michael J. Kelly